**UTAH ENVIRONMENTAL CONGRESS, Plaintiff,**

v.

**Dale BOSWORTH, as Chief of the Forest Service; United States Forest Service; Mary Erickson, as Supervisor of the Fishlake National Forest; and D. Fred Houston, Jr., Richfield District Ranger, Defendants.**

No. 2:04 CV 643 DAK.

United States District Court, D. Utah, Central Division.

April 27, 2005.

James L. Mouritsen, Gregory Barton & Swapp, Lehi, UT, Joel Ban, Wildlaw Southwest, Salt Lake City, UT, Joshua Michael Bowland, Salt Lake City, UT, for Utah Environmental Congress.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the court on Plaintiff Utah Environmental Congress's Olenhouse Motion seeking review and reversal of the Fishlake National Forest's decision memo approving the Seven Mile Spruce Beetle Management Project. Plaintiffs' petition for review is brought pursuant to Federal Rule of Appellate Procedure 15 and *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir.1994). The court held a hearing on Plaintiff's motion on March 10, 2005. Plaintiffs were represented by Joel Ban, and Defendants were represented by John Mangum. Having fully considered the motion, memoranda, and declarations submitted by the parties, the administrative record, and the facts and law relevant to this petition, the court enters the following Memorandum Decision and Order.

## BACKGROUND

This petition for review is an appeal of the decision of the United States Forest Service ("USFS") acting through the Fishlake National Forest ("Fishlake NF") to approve the Seven Mile Spruce Beetle Management Project ("Seven Mile Project") which involves a selective harvest of mature, dead, diseased and dying trees from non-contiguous stands of beetle-infested timber on portions of approximately 123 acres of the Fishlake NF. The Fishlake NF's decision to authorize the Seven Mile Project, issued in a Decision Memo, dated May 7, 2004, and a Superseding Decision Memo, dated October 28, 2004, categorically excluded the Seven Mile Project from environmental review under NEPA. Plaintiff maintains that the Project is illegal under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et. seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et. seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 *et. seq.*, and the statutes' implementing regulations.

### A. Governing Law

Under NFMA, the Forest Service's management of the national forests occurs at two levels. The first level is the forest-wide Forest Plan, which is a broad document incorporating the multiple use and

sustained yield principles of NFMA that is accompanied by an EIS and a public review process. At the second level, the Forest Service implements the Forest Plan by approving particular projects, such as the Seven Mile Project at issue in this case. Each project is subject to further NEPA review, unless there is a basis for categorical exclusion which is at issue in this case, and must be consistent with the forest-wide Forest Plan.

Under NEPA, the Council on Environmental Quality ("CEQ") has promulgated regulations that provide categories of agency action and the required agency review for each category. The categories are (1) actions that require an Environmental Impact Statement ("EIS") because they may significantly affect the environment; (2) actions that require a more limited Environmental Assessment ("EA") to determine whether an EIS is necessary because they may or may not have a significant environmental impact; and (3) actions that qualify for a categorical exclusion from the requirements of preparing an EA or an EIS because they do not have a significant effect on the environment. See 40 C.F.R. §§ 1500.4(p), 1501.4(a)(1), 1501.4(a)(2), 1501.4(c), 1508.4. CEQ's regulations require agencies to adopt procedures that include "specific criteria for identification of classes of actions that normally do not require either an EIS or an EA." *Id.* § 1507.3.

Under the Forest Service's regulations, 40 C.F.R. § 1508.4, a "categorical exclusion" is defined as

a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

The categorical exclusion applied by Defendants in this case became effective in 2003 and is referred to by the parties as Category 14 or Categorical Exclusion 14. Category 14 provides an exclusion for "commercial and non-commercial felling and removal of any trees necessary to control the spread of insects and disease on no more than 250 acres with no more that 1/2 mile of temporary road construction." Forest Service Handbook at 1909.15, ch. 30, section 31.2(14).

**B. The Seven Mile Project**

The Fishlake NF is in south central Utah, comprises 1,424,479 acres, and spans nine counties. Approximately 55 percent, or 770,000 acres, of the Fishlake NF is forested. The Seven Mile Project is located about 22 miles east of Richfield, Utah. The Seven Mile Project consists of four harvest units, totaling 123 acres. Each harvest unit contains several scattered one-acre areas slated for harvest. There are epidemic spruce beetle populations that are continuing to move into the areas to be treated in the Project.

By 1996, the spruce beetle had killed several pockets of Engelmann spruce in the Fishlake NF. Forest managers anticipated that this mortality would spread throughout the Fishlake NF if the beetle infestation was allowed to collapse naturally. Forest managers proposed in 1997 and conducted in 1998 a salvage timber sale of beetle-infested Englemann spruce within portions of a 270–acre area of the Fishlake

NF's 770,000 forested acres. The project, known as the Niotche Salvage Timber Project, was authorized and completed pursuant to a categorical exclusion in effect at the time.

Upon further study of the situation and based on the results of the Niotche Project, forest managers decided to treat the areas within the Seven Mile Project. On February 10, 1999, notice and request for comments for the Seven Mile Project were furnished. Scoping of the public was done and comments were received from seven parties, including Plaintiff. Defendants against sought comments and received comments from Plaintiff in April of 1999. On June 1, 1999, a Decision Memo authorized the Seven Mile Infestation/Seven Mile Salvage Timber Sale under a categorical exclusion, and a letter and copy of the Decision Memo was sent to interested parties and published. The Seven Mile Project at issue in this case is an updated and slightly reduced version of the project announced in 1999.

On March 1, 2000, the Fishlake NF was instructed to conduct an Environmental Assessment ("EA") for the 1999 Project because of the decision in *Heartwood v. USFS*, 73 F.Supp.2d 962 (S.D.Ill.1999), which precluded the use of the timber harvest categorical exclusion relied upon by the Fishlake NF. On June 13, 2000, notice was published that the June 1, 1999 Decision Memo was not valid due to the *Heartwood* decision and that a 2000 EA had been prepared and could be reviewed. Six comments were received, including one from Plaintiff. On November 1, 2000, the Fishlake NF issued a Decision Notice authorizing the project pursuant to the 2000 EA. On December 13, 2000, Plaintiff administratively appealed the Decision Notice to the Regional Forester. On January 26, 2001, the Regional Forester remanded the Decision Notice, finding insufficient analysis in the 2000 EA to determine whether any significant cumulative effects would result from the proposed project.

On May 10, 2001, the Richfield District Ranger instructed the team charged with developing the Seven Mile Project to prepare a new EA to address the issues identified in the Regional Forester's remand. A draft EA was completed in September 2003. Because a new categorical exclusion was created in the summer of 2003 under the Healthy Forests Initiative, a final EA was never re-issued. Officials with the Forest Service who had been doing a pre-decisional review of the draft 2003 EA informed the Fishlake NF team of the exclusion. On April 30, 2004, the team sought and obtained approval from regional officials to use Category 14 of the new categorical exclusions.

On May 7, 2004, the Fishlake NF issued a Decision Memo authorizing the Seven Mile Project under Category 14 of the new categorical exclusions contained in the United States Department of Agriculture Forest Service Handbook 1909.15 chapter 30, section 31.2(14). The Decision Memo states that the Project consists of commercial thinning of Englemann spruce on 123 acres of timber stands based upon increasing spruce beetle infestation and tree mortality levels. The Decision Memo further states that forest managers estimate that, in the absence of thinning, at least 80 percent mortality will occur in non-infested spruce trees within the project area. The Memo Decision also authorized the Project to construct a one-half mile temporary road to better access portions of two of the four treatment units in the Project.

On May 19, 2004, District Ranger Houston talked to Kevin Mueller of the UEC concerning the Seven Mile Project. Mr. Mueller requested certain documents from the project file, which were mailed to him that day. After further consideration of the record and certain preliminary points

made by Plaintiff, Ranger Houston issued a superseding Decision Memo on October 28, 2004. The Superseding Decision Memo deleted authorization for a three-quarter mile road reconstruction and clarified that the one-half mile temporary road constructed for the project would be decommissioned, restored to a natural state, and signed as closed upon completion of the treatment activities. In all other respects, the Superseding Decision Memo was essentially the same as the one issued in May 2004.

Plaintiff filed this action July 14, 2004 with a motion for a preliminary injunction. Because Defendants subsequently agreed that no ground-disturbing activities would occur until July 2005, the parties requested that the preliminary injunction not be heard and that they be allowed to brief the merits of the action.

## STANDARD OF REVIEW

■ Because neither NEPA nor NFMA provides for a private right of action, federal courts review claims that the Forest Service has violated these statutes under the APA. Under Section 706 of the APA, this court must determine, based on the record before the Forest Service, whether the Decision Memo is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Utah Environmental Congress v. Zieroth,* 190 F.Supp.2d 1265, 1267–68 (D.Utah 2002). This standard applies to an agency's application of a categorical exclusion. *Citizen's Comm. to Save Our Canyons v. United States Forest Serv.,* 297 F.3d 1012, 1023 (10th Cir.2002) ("Once an agency established categorical exclusions, its decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision is arbitrary and capricious."). "When reviewing an agency's interpretation and application of its categorical exclusions under

the arbitrary and capricious standard, courts are deferential." *Id.*

In applying the arbitrary and capricious standard, this court must determine whether the "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This court cannot substitute its judgment for that of the Forest Service. Forest officials are charged with using their expertise to consider environmental factors and so long as that agency discretion is rationally exercised, it should not be second guessed by the courts. *See Norton v. Southern Utah Wilderness Association,* 542 U.S. 55, 124 S.Ct. 2373, 2381, 159 L.Ed.2d 137 (2004).

## DISCUSSION

Plaintiff seeks reversal of the Fishlake NF's Decision Memo to categorically exclude the Seven Mile Project. Specifically, Plaintiff argues that the use of the categorical exclusion violates NEPA because the Seven Mile Project will have significant impacts on the environment, the use of the categorical exclusion violates the Forest Service Handbook, and the Seven Mile Project violates NFMA and the Fishlake NF's Land and Resource Management Plan ("Forest Plan") in various respects. Defendants argue that UEC's claims are based upon erroneous assumptions, a misunderstanding of the administrative record, and an incorrect understanding of the regulations and procedures governing the use of categorical exclusions and identification of extraordinary circumstances.

### A. Categorical Exclusion

Plaintiff asserts that Defendants erred in applying the Forest Service's Categorical Exclusion 14, which was made avail-

able in mid–2003, to the Seven Mile Project because the Project will have significant impacts on the environment and, under the regulatory definition of categorical exclusion, a project cannot individually or cumulatively have a significant impact on the environment. 40 C.F.R. § 1508.4 (defining categorical exclusion as a "category of actions which do not individually or cumulatively have a significant effect on the human environment"). Categorical Exclusion 14, provides an exclusion for "commercial and non-commercial felling and removal of any trees necessary to control the spread of insects and disease on no more than 250 acres with no more that 1/2 mile of temporary road construction." Forest Service Handbook at 1909.15, ch. 30, section 31.2(14). Plaintiffs do not make a facial challenge to the categorical exclusion. The only issue presented in this case is whether the categorical exclusion was properly applied.

Defendants assert that they fully complied with NEPA because the Project is within the parameters of Categorical Exclusion 14—the Project is to treat areas of beetle-infested forest in an area smaller than 250 acres with no more than one-half mile of temporary access road. Plaintiff, however, argues that although Category 14 applies to the removal of trees to control the spread of insects and disease, the Fishlake NF has not produced studies or any other support that this Project will meet the cited goal of insect control. Plaintiff contends that the maintenance of viable populations of the three-toed woodpecker is the best way to control spruce beetles and, therefore, a Project that puts the viability of the three-toed woodpecker in question when there is no scientific basis for concluding that logging is an effective way to control spruce beetles is arbitrary.

■ The Forest Plan recognizes that the three-toed woodpecker is "important in combating forest insects, especially spruce beetles." Forest Plan at III–38. However, the Entomologist Report provides a scientific basis that this Project is one that would be effective in controlling the spread of spruce beetle. "The research and information based on the observations of professional forest entomologists and forecasters, however, attests to the effectiveness of silvicultural treatments in reducing beetle populations, stand susceptibility and preventing spread. In infested stands, or those with building beetle problems, sanitation and salvage of susceptible and attacked spruce, combined with the disposal of green cull material is regarded as the most effective silvicultural method." Although woodpeckers are major predators of the spruce beetle, the Biological Evaluation states only that woodpeckers *may contribute* to the control of the beetles. Therefore, the record supports the use of timber harvests as an, if not the most, effective means of controlling the spread of the spruce beetles. Therefore, the court cannot conclude that the decision to use a limited timber harvest to counter the spruce beetle problem was arbitrary and capricious.

■ Next, Plaintiff argues that contrary to the regulatory definition of a categorical exclusion Defendants did not consider the significant individual and cumulative impacts of the Project. Plaintiff points to the fact that the Regional Forester remanded the previous version of the Project under the 2000 EA because the cumulative effects analysis was inadequate. However, subsequent to the Regional Forester's remand of the Seven Mile Project decision in 2001, the Forest Service concluded, after further extensive study, that limited timber harvest projects, such as the Seven Mile Project, "do not individually or cumulatively have a significant effect on the human environment." 68 FR 44599. As

part of the review, the Forest Service explained that

[s]alvaging dead and dying timber provides commercial forest products in support of the Forest Service's legally mandated mission. Numerous laws, including the Multiple Use Sustained Yield Act and the National Forest Management Act, establish the basis for managing national forests in a manner to provide goods and services. In addition, salvage activities, in certain situations, can reduce fire hazard from excessive fuel buildup, or prevent the buildup of insect populations in accumulations of dead trees that can then attack healthy trees; e.g., the spruce beetle. Severe fires and insect infestations can lead to reduced scenic, recreational, wildlife, and timber values on Federal and neighboring Tribal, State, or private land. Public comment from neighbors of Forest Service land expressed concerns regarding risks to their property from untreated fire of insect hazards on neighboring Forest Service land.

■ Plaintiff asserts that this review by the Forest Service is not project specific and, therefore, not persuasive. However, in this case, at the time that the categorical exclusion became available in 2003, the Fishlake NF had already conducted an extensive study of the Project, including a newly updated draft EA in 2003 which analyzed whether the Project would have a significant effect on the human environment individually or cumulatively. And, the Forest Service's interpretation of its own categorical exclusion under NEPA for actions that will not individually or cumulatively have a significant effect on the human environment should be given controlling weight unless the interpretation is plainly erroneous or inconsistent with the terms used in the regulation. *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 510–12, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Alaska Center for Environment v.*

*U.S. Forest Service,* 189 F.3d 851, 857 (9th Cir.1999).

Plaintiff contends that even if the project is small enough to be classified as insignificant in terms of NEPA, the proposed project together with other past and reasonably foreseeable projects will be cumulatively significant. Plaintiff argues that the Fishlake NF should have addressed other adjacent projects. Whether other projects are based on federal or nonfederal lands, the agency must consider the impacts from these activities. *Kettle Range Conservation Group v. United States Forest Serv.,* 148 F.Supp.2d 1107, 1130 (E.D.Wash.2001)(finding that the USFS arbitrarily failed to consider cumulative impacts from adjacent state and private lands). The Farnsworth Aspen timber sale is approximately one mile north of the project area and there has been timber harvesting in the last ten years on private land located between the proposed Seven Mile Project and the Farnsworth Aspen timber sale. In addition, Utah Forest Highway 39 cuts through the Seven Mile Project area and is currently undergoing reconstruction and realignment to upgrade the road from a gravel road to a paved highway.

However, the Draft 2003 EA specifically analyzes the cumulative effects of the Project along with other past, present, and reasonably foreseeable activities. Therefore, it is a misstatement of the record to state that these other projects were not addressed.

■ Because the express requirements of the categorical exclusion are met, absent any disqualifying extraordinary circumstances, the Seven Mile Project required no further environmental review under NEPA. Because categorical exclusions do not apply where there are extraordinary circumstances, Forest Service Handbook 1909.15, ch.30, sect. 30.3, para. 1, the court

must determine whether Defendants were arbitrary and capricious in their determination that no extraordinary circumstances were present.

Defendants contend that Plaintiff repeatedly confuses the issue of the existence of cumulative effects with whether those cumulative effects are significant as an extraordinary circumstances that would preclude the application of a categorical exclusion. The presence of cumulative effects or potential cumulative effects does not preclude the use of a categorical exclusion unless they are significant. Therefore the court will analyze Plaintiff's contentions regarding specific cumulative effects as they relate to extraordinary circumstances.

Extraordinary circumstances have been defined as including potentially significant effects on the following:

a. Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species.

b. Floodplains, wetlands, or municipal watersheds

c. Congressionally designated areas such as wilderness, wilderness study areas, or national recreation areas.

d. Inventoried roadless areas.

e. Research natural areas.

f. American Indians and Alaska Native religious or cultural sites.

g. Archaeological sites, or historic properties or areas.

The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion. It is the degree or the potential effect of a proposed action on these resource condi-tions that determines whether extraordinary circumstances exist.

*Id.* at ¶ 2.

The Decision Memos considered each of the above extraordinary circumstances and concluded that five of the conditions (b, c, e, f, g) were not present in the Forest or in the Project area and two (a & d) were not present in any potentially significantly-impacting manner. In determining whether extraordinary circumstances were present that would preclude application of the categorical exclusion, Defendants state that they relied upon the favorable results of the 1997 Niotche limited timber sale and forest data contained in the 2000 and draft 2003 EAs on the Seven Mile Project.

As to resource category (a), relating to endangered and sensitive species, the Decision Memos state:

The Endangered Species Act requires that federal activities do not jeopardize the continued existence of any species federally listed or proposed as threatened or endangered, or result in adverse modifications to such species' designated critical habitat As required by this Act, potential effects of this decision on federally-listed or proposed species or their critical habitats have been analyzed and documented in a Biological Assessment, and effects on Forest Service Sensitive Species have been documented in a Biological Evaluation (located in Project Record).

This decision will have 'no effect' on the following federally-listed or proposed species or their critical habitats: San Rafael cactus, Maguir daisy, Last Chance townsendia, peregrine falcon, bald eagle, Utah prairie dog and Mexican spotted owl (Biological Assessment, located in Project Record). This decision will have 'no impact' on the following Forest Service Sensitive species: spotted bat, western big-eared bat,

northern goshawk, flammulated owl. This decision may affect, but is not likely to result in a trend toward federal listing or loss of viability for the three-toed woodpecker(Biological Evaluation, located in Project Record).

In its discussion of category (a), the Decision Memo states that the potential effects of the Project on federally-listed or proposed species or their critical habitats were analyzed and documented in a Biological Assessment and effects on Forest Service sensitive species were documented in a Biological Evaluation, both of which are contained in the project record. The only sensitive species affected by the Project was the three-toed woodpecker. Although the Decision Memo acknowledged that the Project may affect the three-toed woodpecker, it concluded that it was not likely to result in a trend toward federal listing or loss of viability.

Plaintiffs contend that the Biological Evaluation for sensitive species prepared in the spring of 2003 contains unsupported conclusions that there will be no cumulative effects to sensitive species and such conclusory statements have been rejected by other courts. Plaintiff also claims that the project record makes a number of unsubstantiated conclusions with regard to cumulative effects. For example, in the Wildlife Report, the Forest Service states that cavity-nesting neotropical migratory birds would decrease in forested areas but concludes that the birds could relocate to other areas without any underlying data or other scientific support.

However, the Fishlake NF conducted additional surveys for cavity-nesting species and avian species in general. Therefore, Plaintiffs claim that the conclusion was reached without any underlying data appears to be unfounded. In addition, with respect to whether there was scientific support for the conclusion, the court must recognize that Forest officials can use their expertise in the consideration of environmental factors. The court cannot conclude that Defendants' conclusions were irrational. The studies acknowledge that these birds have suitable habitats in the areas surrounding the one-acre parcels selected for harvest. It does not appear irrational to this court that the birds would relocate to adjacent areas that contain and provide suitable habitat.

Plaintiff argues that there are several sections of the administrative record in which the Fishlake NF conceded that there would be cumulative impacts to various species which, by definition, precludes usage of a categorical exclusion. The Fishlake NF concluded that there would be cumulative effects to the three-toed woodpecker—"There will be direct effects to the three-toed woodpecker. As spruce trees are harvested in late summer, three-toed woodpeckers would be disrupted from current territories." AR at 1373. However, Defendants did not find that the effects were significant. Defendants found that according to the Biological Evaluation, the Project "may affect, but is not likely to adversely affect three-toed woodpeckers," and "would not contribute to a trend towards federal listing or a loss of population viability."

Under the plain language of the regulations, the mere presence of these conditions does not preclude application of a categorical exclusion. A resource condition must rise to the level of likely having a "significant" environmental effect. In this case, the only species present in the Project area that would be affected, but not in a significant manner, is the three-toed woodpecker. Adequate mitigation measures are included in the Decision Memos and there is adequate surrounding habitat to take care of individually displaced woodpeckers. Therefore, there was ample basis to conclude that there was a

lack of extraordinary circumstances as to this species. The Forest Service is entitled to deference in its application and interpretation of categorical exclusions. And, Plaintiff has not demonstrated that the evidence in the record shows that the impacts on the three-toed woodpecker are significant.

Plaintiff also argues that the cumulative effects on the northern goshawks is contradictory because it states that there will be no cumulative effects and then states that the impacts can be mitigated through certain measures. The record indicates that there are only two known goshawk territories in the Fishlake NF located in the Gooseberry–Niotche area, which is north and northeast of the proposed Project area. Therefore, both areas are outside the Project and cumulative effects areas. The Project area does not contain the combination of components necessary for nesting habitats as found at other nest sites in the Fishlake NF. Therefore, there is no evidence that the Project would have a significant effect on the northern goshawks.

Plaintiff further contends that there was no cumulative impact analysis prepared for migratory birds. However, migratory birds which are not threatened or endangered or otherwise designated as Forest sensitive are not one of the resource conditions that must be evaluated for potential extraordinary circumstances under the applicable categorical exclusion.

Additionally, Plaintiff claims that although the Regional Forester found the cumulative effects analysis for mule deer and elk was inadequate in the prior EA, no additional cumulative effects analysis has been released for these animals. However, the 2003 Draft EA discusses the cumulative effects of the Project on elk and mule deer and concludes that the Project would not adversely affect population numbers or viability of the elk and mule deer.

Plaintiff also argues that Defendants' failure to analyze water quality and the cumulative effects on macroinvertibrates and resident trout is arbitrary. However, the riparian areas within the Niotche Creek Grazing Allotment lie outside of the Seven Mile Project area. Also, according to the Watershed Report, "[t]here are no Water Quality Limited Stream ('WQLS') segments listed by the State of Utah within the cumulative effects area." Only streams listed as WQLS segments are considered "impaired." Outside of the cumulative effects area, and at least ten miles from the Project boundary, there is a segment of Lost Creek that is listed as impaired. The section listed is from the confluence with the Sevier River to four miles up from the confluence. Since this stream segment is outside the cumulative effects area, it was not included in the analysis and would not affect trout or macroinvertibrates in the Project Area. Moreover, the Fishlake NF considered effects of the Project to water quality in the Watershed Report and found the intermittent watercourses are both sufficiently distant from the harvest units and are not of the type that support fish life. The Watershed Report further states that macroinvertibrates were not considered for discussion in the Project because of the lack of streams in the Project or cumulative effects area. Resident trout were similarly not considered in this Project because of the lack of streams or fishable ponds or lakes in the Project or cumulative effects area. Therefore, the record demonstrates that Defendants adequately addressed these issues.

The Decision Memo also individually addressed category (d) because the Project is located adjacent to the UM Plateau—Mt. Terill Inventoried Roadless Area. The Decision Memo states that the implementation of the project activities will not affect the unique characteristics of the roadless

area and is consistent with current agency policy relative to roadless area management. Plaintiff has failed to demonstrate that there are any significant extraordinary circumstances that would prohibit the Fishlake NF from applying the categorical exclusion. Therefore, the court concludes that there is no basis for determining that the Fishlake NF acted arbitrarily or capriciously in applying the categorical exclusion.

**B.  Scoping**

■ Plaintiff argues that the Fishlake NF violated NEPA's scoping requirements when it failed to provide official notice of this Project and allow an opportunity to comment before the project was implemented as a categorical exclusion. Plaintiff contends that scoping is required for all actions that occur on public lands, including those that are categorically excluded from NEPA. However, scoping is not required by NEPA. Rather, the Forest Service has imposed scoping requirements in its Forest Service Handbook. The Forest Service Handbook states that scoping is "to apply to all proposed actions." Forest Service Handbook 1909.15, Chapter 11. It further states that "scoping is required on all proposed actions, including those that would appear to be categorically excluded." *Id.* 1909.15, Chapter 30 section 30.3(3); AR 951.

The Fishlake NF never released its draft 2003 EA for comment. Nor did it publicly allow for comment on whether a categorical exclusion was appropriate. Nonetheless, Defendants argue that the scoping was not deficient. Because the Project is merely a reduced version of the original project, Defendants contend that there was no need to initiate new scoping. Defendants began public scoping for the Project in February 1999, with subsequent scoping notices on April 14, 1999, June 9, 1999, and June 13, 2002. Additionally, the Project was published in the Forest's

quarterly Schedule of Proposed Actions ("SOPA") each quarter since 2001. In response to the February 2004 SOPA, public comments supporting the Project were received on April 26, 2004, and May 3, 2004. On April 23, 2004, Ranger Houston contacted Plaintiff to notify it of plans to proceed with the Project under the new categorical exclusion authority. Ranger Houston provided requested materials to Plaintiff by email. And, Plaintiff was granted two weeks to submit further comments on the project. UEC's submitted comments stated that they were scoping comments. Although UEC's comments were submitted after the initial Memo Decision, they were submitted and considered before the Superseding Decision Memo.

The court concludes that the scoping was adequate. The Project had been through several comment periods from 1999 to 2004. Furthermore, Plaintiff was allowed to comment on the use of the categorical exclusion. Therefore, there is no basis for reversal on this issue.

**C.  Monitoring Requirements**

■ Under NFMA, any projects undertaken by the Fishlake NF must be consistent with the Fishlake Land Resource and Management Plan ("Forest Plan"). The Fishlake NF determined that for each threatened, endangered, sensitive, and Management Indicator Species that there would be no effect. Plaintiff characterizes the main justification for this conclusion as being that species habitats were not found in the project area and that there is no known suitable habitat. Plaintiff asserts that missing from the report is any actual population data that would validate these conclusions. Therefore, Plaintiff contends that the Fishlake NF is not in compliance with the monitoring requirements of its Forest Plan.

Plaintiff asserts that NFMA requires the Forest Service not just to collect hard MIS population trend data, but to determine how the cutting of 123 acres of Englemann spruce would affect the quantitative MIS population trends. Plaintiff contends that the Forest Service must collect population trend data for MIS at the project level. See *Colorado Wild v. United States Forest Serv.*, 299 F.Supp.2d 1184, 1188 (D.Colo.2004).

However, Plaintiff's general challenge to monitoring fails because it assumes the monitoring requirements of part 219 of the 1982 regulations were still in effect at the time the Project was approved. Those regulations were not in effect after November 9, 2000. The 1982 forest planning regulations at 36 C.F.R. Part 219 were superseded in November 2000, when new regulations were promulgated. 65 Fed. Reg. 67568–581 (Nov. 9, 2000). The transition provision of the 2000 regulations was 36 C.F.R. 219.35. Under the 2000 regulations, forests units were required to consider the "best available science" in implementing site-specific projects within a forest unit. *Id.* 219.35(a). The 2000 regulations have since been replaced by new regulations effective January 2005 (70 Fed.Reg. 1023) and were never legally binding on the USFS for planning purposes as opposed to site-specific projects. The Department of Agriculture promulgated an interpretive rule (Appendix B to Section 219.35 as that section was in effect from November 2000 to January 2005) that clarifies that during the transition period of November 2000 to January 2005 only the transition provisions of section 219.35 of the 2000 regulations applied and neither the remainder of the 2000 planning regulations nor any of the 1982 regulations were binding on site-specific decisions. Id. Appendix B, subparagraph 2 ("The 1982 rule is not in effect.... Projects implementing land management plans must comply with the transition provisions of Section 219.35, but not any other provision of the 2000 planning rule."). Therefore, the 1982 do not apply to this action. Accordingly, if forest officials followed the best available science in a manner consistent with the requirements of the applicable Forest Plan, the USFS complied with NFMA.

Furthermore, the record demonstrates that quantitative MIS population trend data is collected annually on the Fishlake NF. The data and findings are then summarized and described in "Life History and Analysis of Endangered, Threatened, Candidate, Sensitive, and Management Indicator Species of the Fishlake National Forest", which is updated annually Population trend monitoring is only required forest-wide, not at the project level. Even though the Forest Service has conducted many surveys and monitoring studies related to the Project, it was not necessary. Effects of the Project on MIS and population trends are discussed in the Wildlife Report and the draft 2003 EA. The Life History Report discusses the hairy woodpecker, the western bluebird, the mountain bluebird, Lincoln's sparrow, the song sparrow, the yellow warbler, Vesper's sparrow, and Brewer's sparrow. These species are also addressed in the Project's Wildlife Report. The direct, indirect and cumulative effects of the Project on MIS are discussed in the 2003 Draft EA.

Plaintiff also makes several species-specific allegations. Plaintiff contends that the Arizona willow is found in Niotche Creek allotment in project area and may be impacted from grazing. However, the record indicates that the Project area does not overlap with location of the Arizona willow on the Niotche Creek Grazing allotment. The Seven Mile project is located in the Lost Creek drainage, the location of the Arizona willow is in the Seven Mile drainage, which is one-half to one mile

from the Project area. Therefore, there would be no impact on the species because there is no suitable habitat for the Arizona willow in the Project area.

Although Plaintiff alleges that the Fishlake NF did not collect monitoring data for the San Rafael cactus, Maguire daisy, Last Chance townsendia, peregrine falcon, bald eagle, Utah prairie dog, and Mexican spotted owl, the Forest Service has conducted many surveys and monitoring studies related to the Project and these species. The Biological Assessment notes that the Project Area is outside of the known geographical range of the San Rafael cactus and the Last Chance townsendia and also lacks suitable habitat for the Maguire daisy. The Project area also does not contain typical nesting habitat components for the peregrine falcon or Utah prairie dog and does not have the necessary prey base for the bald eagle. Furthermore, surveys have shown that there are no Mexican spotted owls in or adjacent to the Project area. Also, the Project is located outside the known geographical range of the rydberg milkvetch and there is no habitat for the species in the proposed treatment area.

Plaintiff also claims that bald eagles have not been monitored even though they are in the area from October through April. But, because the bald eagles only use the area during migration and there is not a prey base for bald eagles within the Project area, Defendants determined that the Project would have no effect on the bald eagle. Moreover, the Forest Service has conducted many surveys and monitoring studies related to avian species.

Plaintiff also asserts that the spotted bat was not monitored annually and no population data was included even though there is potential habitat adjacent to the project area. The Forest Service conducted a Biological Evaluation that included a study of impacts to the spotted bat population and found that potential habitat for the spotted bat occurs in cliffs located in the areas adjacent to, but not in the Project area and cumulative effects area. The species has not been reported or observed in the area. Therefore, the Biological Evaluation reasonably concluded that the Project would have no effect on the spotted bat.

Plaintiffs further contend that the macroinvertebrates (MIS) and Bonneville Cutthroat trout were not monitored in the project area because of belief that streams are outside area. The court discussed this above and concluded that Project would not affect these species.

Furthermore, although willow flycatchers exist in the Fishlake NF, they are not the southwestern subspecies, which is the only TES or MIS species. The willow flycatchers in the Fishlake NF are not the endangered species, therefore, it did not need to be addressed in the Project analysis. Also, the record indicates that the three-toed woodpecker is not an MIS for the Fishlake NF. However, it is a sensitive species for this Forest Service Region. Defendants found that according to the Biological Evaluation, the Project "may affect, but is not likely to adversely affect three-toed woodpeckers," and "would not contribute to a trend towards federal listing or a loss of population viability." Furthermore, there are only two known goshawk territories in the Fishlake NF located in the Gooseberry–Niotche area, which is north and northeast of the proposed Project area. Therefore, both areas are outside the Project and cumulative effects areas. The Project area does not contain the combination of components necessary for nesting habitats as found at other nest sites in the Fishlake forest.

Plaintiff incorrectly assumes that no monitoring was done wherever the forest monitoring data showed that there was no habitat present in the Project area essen-

tial to support a given species. In locations where the necessary habitat to support a species is not present, it is rational to assume that the species is not present. Predictions of where species are located, and thus where monitoring is conducted, are based in the first instance upon the location of the appropriate habitat essential to support a species. Finally, without affirmatively showing that the Project may significantly adversely affect any of the species for which Plaintiff could properly show any required monitoring has not occurred, Plaintiff cannot demonstrate that a disqualifying extraordinary circumstance truly exists. The record in this case demonstrates, in any event, that the Fishlake NF has monitored MIS in accordance with its obligations under NFMA and the Forest Plan.

## D. Minimum Viable Population

■ NFMA regulations provide that fish and wildlife habitat should be managed to maintain viable populations of existing native and desired non-native species in the planning area. To determine whether habitat is sufficient for these purposes, the Forest Service identifies management indicator species ("MIS") and focuses its analysis of a proposed project's effects upon the habitats of these representative species.

Plaintiff argues that for the MIS in the Project area, the Fishlake NF failed to show that these species are found in minimum viable population numbers or are well distributed throughout the forest. Under the Forest Plan, the minimum viability for the northern goshawk has been set at 289 pairs, and for cavity-nesters, including the three-toed woodpecker, has been set at 8,412 pairs. Plaintiff claims that the population viability for MIS such as the northern goshawk and the three-toed woodpecker is well below minimum viability. Plaintiff argues that this indicates a serious forest management problem in the forest and the Seven Mile Project will only exacerbate the population crisis.

Plaintiff further argues that the Fishlake NF's environmental planning documents state that the sensitive three-toed woodpecker would be directly effected by this project, including displacement. These impacts are significant and categorical exclusion of a project that will significantly impact sensitive species is arbitrary and capricious.

As with the above issue, Defendants argue that Plaintiff improperly relies on a superceded regulation about population viability and then fails to demonstrate any nexus between the Seven Mile Project and Plaintiff's fears about assumed impacts on the northern goshawk and the three-toed woodpecker. The Forest Service has conducted many survey and monitoring studies related to the Project. And, quantitative MIS population trend data is collected annually on the Fishlake NF. The data and findings are then summarized and published. These species are addressed in the Project's Wildlife Report. Also, direct, indirect, and cumulative effects of the Project on MIS are discussed in the 2003 draft EA.

The Wildlife Report states that the viability of the goshawk population is under review, the downward trends are possibly a result of severe drought conditions in Southern Utah, approximately 27 goshawk nests were in the Forest as of the 2002 nesting season, and surveys for goshawk determined that there are no territories within the Project area. Defendants argue that given the absence of any goshawk nests in the Project area, the small size of the Project compared to the forested lands within the Fishlake NF as a whole, and the lack of any evidence of impact on the goshawk's population viability, there is no supporting nexus to justify stopping the

Project just because the total numbers of known goshawks may be below earlier viability estimates in the Forest Plan. Absent a linkage between the Project and the goshawk's viability, the Project must be deemed consistent with the Forest Plan.

. With respect to the three-toed woodpecker, there is minimal potential for displacement on a relatively small number of individual woodpeckers. However, the studies in the Project record show no probable significant effect from the Project on the viability of this species because, while some suitable habitat would be removed, the Project would lead to long term improvement and there are numerous acres within the area that will continue to support stable populations of three-toed woodpecker. The Decision Memo also contained several mitigation measures for the three-toed woodpecker, including a prohibition to cutting down trees with nests, leaving at least three snags per acre, and providing additional artificial nest boxes in surrounding areas. Considering those mitigation measures and the large amount of surrounding forest land which also serve the same woodpeckers, the Project is consistent with the Forest Plan.

### E. Old Growth

■ Plaintiff further argues that Fishlake NF''s Seven Mile Project fails to account for the minimum amount of old growth forest-wide even though this project will exclusively log old growth. The Forest Plan requires that "in forested areas of a unit, 5% or more should be in old-growth." Forest Plan page IV–11. Plaintiff contends that there is no way the Fishlake NF can ensure compliance with this standard because the Fishlake NF has never undertaken old growth surveys to surmise how much old growth there is. Not only is this a violation of the Forest Plan, but this failure cannot be separated from the Fishlake NF's lack of minimum

viability for old growth dependent species discussed above. The protection of sufficient old growth is integral to maintenance of minimum viability for old growth MIS species such as the northern goshawk. Despite the fact that the Fishlake NF identified active northern goshawk nests near the project area, they failed to identify nest replacement areas.

Plaintiff's assertions that the Project authorizes logging exclusively old growth and that the Fishlake NF has never undertaken old growth surveys are both incorrect. The Forest Plan defines "old growth" as "[a] stand of trees that is past full maturity and showing decadence." Id. VI–17. The Vegetative Prescription for the Seven Mile Project, prepared by Certified Siviculturist Allen Henningson, states that the stands, while meeting a portion of the definition for old growth, are not considered to be old growth. Satellite image data was received on the Fishlake NF around July 8, 2002. According to the satellite image data, 6% of the forested unit of the forest is in old forest. Therefore, if the satellite imagery method of determining old-growth is used, at least 5% of the forested unit would still be maintained after implementation of the Seven Mile Project.

Accordingly, the court concludes that Defendants adequately addressed old growth requirements under the Forest Plan. Therefore, there is no basis for reversal on this issue.

### F. Management Areas

#### (1) Management Area 4A

■ Plaintiff argues that the Fishlake NF failed to analyze water quality and aquatic species because of their belief that there are no streams in the project area/cumulative effects area. Plaintiff contends that the failure to monitor water quality and the overall viability of fish and

their habitat is in violation of NFMA and the Forest Plan's direction.

Management area 4A is included in fifteen percent of the treatment areas of the Project and affects two of the harvest units. The general management prescription states, "emphasis is on fish habitat improvement where aquatic habitat is below productive potential." Forest Plan IV–85. However, as stated above, the record demonstrates that there are no riparian or aquatic habitat areas in the Project Area. Because there are no fish or macroinvertibrates to be supported or protected, there is no conflict with the Forest Plan.

### (2) Management Area 4B

█ Plaintiff contends that rather than promote MIS habitats as is required under the Forest Plan, this Project will destroy the habitats of the northern goshawk and three-toed woodpeckers. Management Area 4B is about 35% of the treatment area. There are at least two management goals authorized in the Forest Plan for this portion of the treatment area: managing to optimize habitat for the selected MIS, and managing tree stands for a variety of desired characteristics with a full range of harvest methods available for use.

There is nothing in the Forest Plan that indicates that MIS management must preclude tree species management in the absence of potential significant impacts to MIS. And, as discussed above, there is adequate evidence in the record for Defendants to rationally conclude that there are no significant impacts to MIS in the Project area.

Therefore, there are no grounds for reversal of Defendants' memo decisions approving the Project based on the Forest Plans requirements for management areas.

### CONCLUSION

Based on the above reasoning, the court concludes that Plaintiffs' Olenhouse Motion for review of the Forest Services' approval of the Seven Mile Spruce Beetle Management Project is DENIED. The record demonstrates no grounds for reversal. Therefore, this court affirms Defendants' approval of the Seven Mile Spruce Beetle Management Project.