**F I L E D**

<u>PUBLISH</u>

**February 23, 2007**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FOREST GUARDIANS, a nonprofit
corporation; SINAPU, a nonprofit
corporation; CENTER FOR NATIVE
ECOSYSTEMS, a nonprofit corporation;
ANIMAL PROTECTION OF NEW
MEXICO, a nonprofit corporation;
ANIMAL PROTECTION INSTITUTE, a
nonprofit corporation; and CARSON
FOREST WATCH, a nonprofit corporation,

     Plaintiffs-Appellants,

v.

HARV FORSGREN, Regional Forester,
U.S. Forest Service Region 3; UNITED
STATES FOREST SERVICE, a Federal
Agency; ANN M. VENEMAN, Secretary
of the United States Department of
Agriculture; UNITED STATES
DEPARTMENT OF AGRICULTURE, a
Federal Department; GALE NORTON,
Secretary of United States Department of
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR, a
Federal Department; STEVEN
WILLIAMS, Director, United States Fish
and Wildlife Service; UNITED STATES
FISH AND WILDLIFE SERVICE, a
Federal Agency; H. DALE HALL, Director,
United States Fish and Wildlife Service,
Region 2,

     Defendants-Appellees.

No. 05-2181

Matthew K. Bishop, Western Environmental Law Center, Taos, New Mexico, for Plaintiffs-Appellants.

Mark R. Haag, Attorney (Kelly A. Johnson, Assistant Attorney General; James C. Kilbourne, Attorney) Environmental & Natural Resources Division, Department of Justice, Washington, D.C., for Defendants-Appellees.

Before **MURPHY**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

**BALDOCK**, Circuit Judge.

The United States Fish and Wildlife Service (FWS) has listed a "distinct population segment" (DPS) of Canada Lynx as "threatened" under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-44. See Determination of Threatened Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related Rule, 65 Fed. Reg. 16052 (March 24, 2000) (Final Rule), clarified by Notice of Remanded Determination of Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx, 68 Fed. Reg. 40076 (July 3, 2003) (Rule Clarification). Forest Guardians and other environmental nonprofit groups (collectively Forest Guardians) seek to compel the United States Forest Service pursuant to § 7(a)(2) of the ESA to consult with FWS on the question of whether the Land and Resource Management Plans (LRMPs) for the Carson and Santa Fe National Forests

2

may jeopardize the continued existence of the lynx. See 16 U.S.C. §§ 1536(a)(2).[1] We hold Forest Guardians' allegation of "agency action" in the amended complaint insufficient to sustain its claim against the Forest Service under § 7(a)(2) of the ESA.

I.

Congress enacted the ESA to provide for the "conservation, protection and propagation" of wildlife facing extinction. S. Rep. No. 93-307, at 1, reprinted in 1973 U.S.C.C.A.N. 2989; see also 16 U.S.C. § 1531(b). The ESA authorizes FWS to designate a DPS of a species as "endangered" or "threatened." See 16 U.S.C. §§ 1532(16), 1533(a)(1). When FWS designates a DPS of a species as endangered or threatened, sister agencies assume special obligations to protect that species. See Wyoming Farm Bureau Fed'n v. Babbitt, 199 F.3d 1224, 1231 (10th Cir. 2000). The principal obligation at issue in this case is encompassed within § 7(a)(2) of the ESA. That section requires an acting agency (allegedly the Forest Service) to consult with FWS to ensure the former's "action" (allegedly the LRMPs) is unlikely to jeopardize the continued existence of an endangered or threatened species:

Each federal agency shall, in consultation with and with the assistance of the

---

[1] Subject to exceptions not applicable here, the citizen-suit provision of the ESA provides a private right of action "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the Eleventh Amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof[.]" 16 U.S.C. § 1540(g)(1)(A). Forest Guardians' prayer that the Forest Service be directed to consult with FWS pursuant to § 7(a)(2) constitutes a request for mandatory injunctive relief.

3

[FWS], insure that any *action* authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species . . . .

16 U.S.C. § 1536(a)(2) (emphasis added).[2] The applicable FWS regulation, in turn, defines "action" as "all *activities or programs* of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States . . . ." 50 C.F.R. § 402.02 (emphasis added).

The district court dismissed Forest Guardians' amended complaint in its entirety. Relevant to our task, the court dismissed Forest Guardians' ESA claim against the Forest Service pursuant to Fed. R. Civ. P. 12(b)(6).[3] According to the court, the DPS listing for the Canada Lynx is limited to a fourteen State area that does not encompass the Carson and Santa Fe National Forests, both of which are located entirely within the State of New Mexico. Because FWS has not listed the lynx as threatened in New Mexico, the district court

---

[2] For a detailed discussion of the ESA consultation process see 50 C.F.R. Pt. 402, Subpt. B. See also Stanford Environmental Law Society, The Endangered Species Act 83-98 (2001).

[3] On appeal, FG also presses claims against FWS arising under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. The district court dismissed these claims on the pleadings pursuant to Fed. R. Civ. P. 12(c). Because we conclude the Forest Service in this case has no duty to consult with FWS under the ESA, Forest Guardians' contention that FWS's decision not to require consultation with the Forest Service constitutes a violation of the APA necessarily fails. See Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 72 (2004) ("Before addressing whether a NEPA-required duty is actionable under the APA, we must decide whether NEPA creates an obligation in the first place.").

concluded the ESA does not require the Forest Service to consult with FWS.[4]

Our jurisdiction to review the district court's dismissal of Forest Guardians' ESA claim arises under 28 U.S.C. § 1291. Our review is de novo. See Moya v. Schollenbarger, 465 F.3d 444, 454 (10th Cir. 2006). We accept the factual allegations of the amended complaint as true but owe no such allegiance to its legal conclusions. See Jordan v. Alternative Res. Corp., 458 F.3d 332, 338 (4th Cir. 2006). Because we conclude Forest Guardians has not adequately alleged the agency action necessary to trigger the Forest Service's duty to consult with FWS under § 7(a)(2) of the ESA, we need not reach the question of whether the DPS listing of Canada Lynx would otherwise require the Forest Service to consult with FWS on the Carson and Santa Fe National Forest Plans. See Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073, 1088 (10th Cir. 2006) (court of appeals may affirm on any ground supported by the record, provided the parties have had an opportunity to address such ground).

---

[4] FWS's Final Rule states the "population segment" for Canada lynx "occurs in forested portions of the States of Colorado, Idaho, Maine, Michigan, Minnesota, Montana, New Hampshire, New York, Oregon, Utah, Vermont, Washington, and Wisconsin." Final Rule, 65 Fed. Reg. at 16052. The regulation listing endangered or threatened wildlife found at 50 C.F.R. § 17.11(h) adds Wyoming to the list of areas where Canada lynx are threatened. Rejecting a later comment suggesting the range of the lynx should include the northern mountain ranges in New Mexico, the FWS stated in its Rule Clarification: "We do not consider lynx recently released in Colorado that strayed into New Mexico as sufficient reason to include New Mexico within the range of native lynx because there is no evidence habitat in New Mexico historically supported lynx." Rule Clarification, 68 Fed. Reg. at 40083.

II.

We begin with the relevant allegation of Forest Guardians' amended complaint. Paragraph 11 states: "Implementation of the Carson and Santa Fe National Forest LRMPs are 'agency actions' that 'may affect' listed lynx and, as such, the Federal-Defendants must undergo formal § 7 consultation to insure that such actions are not jeopardizing the continued existence of lynx." According to the Forest Service, "the Carson and Santa Fe Forest Plans do not constitute ongoing 'agency action' for purposes of § 7(a)(2)." To support its position, the Forest Service relies on the Supreme Court's recent decision in Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004). In Norton, the Court concluded that while approval of a land use plan promulgated by the Bureau of Land Management (BLM) constituted "major Federal action" under the National Environmental Policy Act (NEPA), such action was complete once BLM approved the plan. Id. at 73. The Court rejected the notion that the plan itself constituted "ongoing 'major Federal action.'" Id. Forest Guardians points out, however, that this case arises under the ESA, not NEPA, and that "action" under § 7 of the ESA is "broadly defined." To support its allegation of agency action, Forest Guardians relies principally on the Ninth Circuit's decision in Pacific Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994). In Pacific Rivers, the court held "LRMPs constitute continuing agency action requiring consultation under § 7(a)(2) of the ESA." Id. at 1051-52. Before turning to an analysis of these competing arguments, a brief overview of LRMPs is appropriate to add focus to the narrow issue before us, that is, the sufficiency of Forest Guardians' allegation that "[i]mplementation of the Carson and Santa Fe National

6

Forest LRMPs are 'agency actions'" within the meaning of § 7(a)(2).

A.

The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600-1614, directs the Forest Service to develop a LRMP for each unit of the National Forest System. See id. § 1604(a). Regulations contained in Subpart A of 36 C.F.R. Pt. 219 set forth the process for developing, amending and revising LRMPs. LRMPs are "embodied in appropriate written material[.]" 16 U.S.C. § 1604(f)(2). LRMPs reflect, among other things "proposed and possible actions[.]" Id.[5] Consistent with the NFMA, the applicable Forest Service regulation defines a "plan" as "[a] document or set of documents that integrates and displays information relevant to management of a unit of the National Forest System." 36 C.F.R. § 219.16. LRMPs developed pursuant to the NFMA and Subpart A of the regulations–

---

[5] The Forest Service Handbook 11.2 (2006) (available at http://www.fs.fed.us/im/directives/fsh/1909.12/1909.12_10.doc) discusses the "proposed and possible actions" contained within a LRMP:

The proposed and possible actions listed in the land management plan should include those actions anticipated to provide the array of multiple-use opportunities or resource management programs that a forest, grassland, prairie, or other comparable administrative unit expects to provide. The proposed and possible actions may be displayed in an appendix. . . .

Proposed and possible actions may be presented in a brief summary of the types of projects that may occur in the plan decade to maintain or move toward the desired conditions. . . . Proposed and possible actions should not speculate about the specific amount, quantities, frequency, or magnitude of actions during the plan decade.

(internal citation omitted).

7

generally contain desired conditions, objectives, and guidance for project and activity decisionmaking in the plan area. Plans do not grant, withhold, or modify any contract, permit or other legal instrument, subject anyone to civil or criminal liability, or create any legal rights. Plans typically do not approve or execute projects and activities. Decisions with effects that can be meaningfully evaluated typically are made when projects and activities are approved.

Id. § 219.3(b) (internal citation omitted). In short, LRMPs are "a framework for making later project decisions rather than . . . a collection of project decisions." Review and Comment and Appeal Procedures for National Forest Planning and Project Decisions; Requesting Review of National Forest Plans and Project Decisions, 58 Fed. Reg. 19369, 19370 (April 14, 1993) (Plan Review).[6]

As we have oft explained, management of LRMPs occurs at two levels. The first level is "programmatic:"

At the programmatic level, the Forest Service creates general, forest wide planning goals memorialized in a forest plan. Because the Forest Service must account for a variety of different interests, each forest plan *envisions* the forest will be used for multiple purposes, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). At the same time, the forest plan provides for "diversity of plant and animal communities based on the suitability and capability of the specific land area." Id. § 1604(g)(3)(B).

---

[6] The regulations identify five "components" of a LRMP: (1) "Desired conditions," (2) "Objectives," (3) "Guidelines," (4) "Suitability of areas," and (5) "Specific areas." 36 C.F.R. § 219.7(a)(2). Subsections (i) and (ii) describe desired conditions and objectives as "aspirations." Id. § 219.7(a)(2)(i), (ii). Desired conditions, objectives, and guidelines "are not commitments or final decisions approving projects and activities." Id. § 219.7(a)(2)(i), (ii), (iii). Subsection (iv) and (v) respectively address suitable uses and special area designations within a forest unit with similar verbiage. Id. § 219.7(a)(2)(iv), (v).

Utah Envtl. Cong. v. Bosworth, 443 F.3d 732, 737 (10th Cir. 2006) (emphasis added).  The second level is "project:"  We have repeatedly stated that "[t]he Forest Service is required to implement the forest plan by approving or disapproving specific projects.  Projects must be consistent with the governing forest plan and are subject to the procedural requirements of NEPA."  Lamb v. Thompson, 265 F.3d 1038, 1042 (10th Cir. 2001); accord Silverton Snowmobile Club v. United States Forest Serv., 433 F.3d 772, 785 (10th Cir. 2006); Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1168 (10th Cir. 1999); see also 36 C.F.R. § 215.1(recognizing the implementation of LRMPs through projects and activities).  "[I]mplementation of the LRMP occurs . . . when individual site-specific projects are proposed and assessed[,]" and not before.  Idaho Conservation League v Mumma, 956 F.2d 1508, 1512 (9th Cir. 1992).  To assess a proposed project or action, the Forest Service must conduct an analysis and evaluation of such project or action to assure compliance not only with the LRMP but also with applicable laws and regulations.  See 36 C.F.R. § 219.8(b), (e); Forest Service Manual 1926.41 (2006) (available at http://www.fs.fed.us/im/directives /fsm/1900/1920.doc); see generally 36 C.F.R. Pt. 215 (addressing notice, comment, and appeals procedures for Forest Service projects and activities).  Only then may an irreversible commitment of forest resources occur.  See Plan Review, 58 Fed. Reg. at 19370.

B.

Much like the promulgation of a regulation, we have little doubt after <u>Norton</u> that the act of approving, amending, or revising a LRMP constitutes "action" under § 7(a)(2) of the ESA. <u>See</u> 50 C.F.R. 402.02 (listing the "promulgation" of regulations as an example of "action" under § 7). Nothing in the foregoing overview, however, suggests that LRMPs, once approved, amended, or revised, constitute ongoing, self-implementing action under §7(a)(2). <u>Compare</u> <u>Norton</u>, 542 U.S. at 72-73.[7] To the contrary, the NFMA, FWS regulations, and Tenth Circuit case law suggest LRMPs are implemented through the approval of proposed projects and activities that are consistent with the plan's direction.

---

[7] Interestingly, the NEPA regulation addressing the meaning of "major federal action," the phrase discussed in <u>Norton</u>, states: "Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated or approved by federal agencies; *new or revised* agency rules, regulations, *plans*, policies, or procedures; and legislative proposals . . . . 40 C.F.R. 1508.18(a) (emphasis added). Subsection (b) of the regulation indicates that–

Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as . . . formal documents establishing an agency's policies which will result in or substantially alter agency programs.
(2) *Adoption of formal plans*, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, *upon which future agency actions will be based*.
(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan . . . .
(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. . . .

Id. § 1508.18(b) (emphasis added).

10

Once the LRMP is in place, "agency action" takes place at the project level. See National Forest System Land and Resource Management Planning, 60 Fed. Reg. 18886, 18901 (Proposed Rule, April 13, 1995). Rather than actions themselves, LRMPs appear more akin to "road maps" on which the Forest Service relies to chart various courses of action. A LRMP is, in the truest sense, a document that creates a *vision* by integrating and displaying information relevant to the management of a national forest. See 36 C.F.R. § 219.16; see also Bosworth, 443 F.3d at 737 (describing LRMPs as envisioning forest uses); compare Norton, 542 U.S. at 59 (describing land use plans as guiding and controlling future management actions).

Nonetheless, Forest Guardians insists the definition of "action" as used in § 7(a)(2) of the ESA is broad enough to encompass the sizable entirety of the respective LRMPs for the Carson and Santa Fe National Forests, each of which sets policy for a forest exceeding 1.3 million acres in land mass.[8] That definition of "action," complete with examples,

---

[8] The Carson National Forest encompasses nearly 1.4 million acres of land in northern New Mexico. The forest, which abuts the State of Colorado, is divided into six Ranger Districts. See generally http://www.fs.fed.us/r3/carson/index.shtml (Carson National Forest Homepage). The Santa Fe National Forest encompasses 1.6 million acres of land in north-central New Mexico and is divided into five Ranger Districts. See generally http://www.fs.fed.us/r3/sfe/index.html (Santa Fe National Forest Homepage). The Carson National Forest Plan, first approved in 1986, is available online at http://www.fs. fed.us/r3/carson/plans/forest_plan/forest_plan.shtml. The plan divides the forest into 21 "management areas" and addresses the following concerns: air, cultural resources, facilities and corridors, fire, lands, law enforcement, minerals, people, range, recreation, special uses, sustainable forests, timber, travel, visual, watershed, and wildlife and fish. The Santa Fe National Forest Plan, approved in 1987, is also available online at http:// www.fs.fed.us/r3/sfe/projects/plansReports/index.html. That plan divides the

(continued...)

encompasses–

> all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States . . . .  Examples include, but are not limited to:
> (a) actions intended to conserve listed species or their habitat;
> (b) the promulgation of regulations;
> (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
> (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02; see also 40 C.F.R. § 1508.18(b)(3) (describing a "program" as "a group of concerted actions to implement a specific policy or plan").

We do not doubt a LRMP *might* authorize an activity or program, and that such authorization could constitute "action" within the meaning of § 7(a)(2).  Similarly, if the LRMP demanded the Forest Service fund or carry out an activity or program, this too could constitute "action" under § 7(a)(2).  Such "action," in turn, could give rise to a duty to consult *on that particular action* under § 7(a)(2) of the ESA.  See 16 U.S.C. § 1536(a)(2).  LRMPs, however, *"typically* do not approve or execute projects and activities," and do not authorize the irreversible commitment of forest resources.  36 C.F.R. § 219.3(b) (emphasis added); see also id. § 215.12 (recognizing a LRMP may include a "project decision");

_____

[8](...continued)
forest into 12 "management areas," while addressing the following concerns:  recreation , off-road vehicle use, visual quality, cultural resources, wildlife, wildlife habitat diversity, range, timber, firewood, watershed, transportation, and research.  Compare Norton, 542 U.S. at 70-71 (discussing the complexity of a land use plan for 1.5 million acres of BLM-administered land).  The Forest Service must revise a LRMP at least once every fifteen years, but may amend it, in compliance with set procedures, at any time.  16 U.S.C. § 1604(f)(4), (f)(5).  Both plans have been amended periodically.

compare Norton, 542 U.S. at 69 ("[A] land use plan is not ordinarily the medium for affirmative decisions that implement the agency's 'projections.'" (internal brackets omitted)); see also Plan Review, 58 Fed. Reg. at 19370 (discussing the nature of LRMPs and project decisions).[9]

Yet whether a particular activity or program is part of a LRMP or subsequently authorized at the project level, the ESA's definition of "action" still requires Forest Guardians to direct its focus on an activity or program that allegedly threatens the lynx. This is because *only* in the presence of such activity or program, *i.e.*, "agency action," does a duty to consult ever arise under § 7(a)(2). See 50 C.F.R. § 402.02; California Sportfishing Prot. Alliance v. Federal Energy Regulatory Comm'n, 472 F.3d 593, 595 (9th Cir. 2006) ("The ESA and the applicable regulations . . . mandate consultation . . . only before an agency takes some affirmative agency action, such as issuing a license."). Needless to say then, we are hard pressed to conclude, based on the allegations of the amended complaint, that the two LRMPs on which Forest Guardians demands consultation constitute, *in their entirety,* an activity or program, *i.e.*, an "action, authorized, funded, or carried out" by the Forest Service.

---

[9] Our reading of Norton reveals that a "land use plan" promulgated by the BLM does not differ significantly from a LRMP promulgated by the Forest Service. See Norton, 542 U.S. at 67-72. Both types of plans embrace an "immense scope of projected activity." Id. at 70. Like a LRMP, "a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." Id. at 71. Consistent with this view, the Court concluded that "a statement in a plan that BLM 'will' take this, that, or the other action," is not a legally binding commitment enforceable under the APA. Id. at 69; compare 36 C.F.R. § 219.3(b) (stating LRMPs do not "create any legal rights").

13

16 U.S.C. § 1536(a)(2); compare Lujan v. National Wildlife Fed'n, 497 U.S. 871, 890-94 & nn. 2,3 (1990) (rejecting a "generic" challenge under the APA to the "entirety" of BLM's "land withdrawal review program" couched as unlawful agency action).

1.

We have searched Forest Guardians' amended complaint in vain for some concrete allegation of "action" beyond the mere "implementation of the . . . LRMPs" which might allow us to sustain it on the issue before us. See, e.g., Turtle Island Restoration Network v. National Marine Fisheries Serv., 340 F.3d 969, 970-71 (9th Cir. 2003) (agency issuance of fishing permits required § 7(a)(2) consultation); Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998) (agency renewal of water contracts required § 7(a)(2) consultation). As to LRMPs generally, Forest Guardians alleges in paragraph 102 of the amended complaint that "LRMPs include programs or practices that 'result in: habitat conversion; fragmentation or obstruction to lynx movement; roads or winter recreation trails that facilitate access to historical lynx habitat by competitors; and fire exclusion which changes the vegetation mosaic maintained by natural disturbance processes.'" Yet nowhere in the amended complaint can we find any mention, specific to the respective LRMPs for the Carson and Santa Fe National Forests, of an authorized program, practice, project, or activity that might amount to "action" threatening the continued existence of the lynx. See California Sportfishing, 472 F.3d at 597 ("The triggering mechanism for consultation [under § 7(a)(2)] is an agency action, not the listing of a species.").

Similarly, paragraph 110 of the amended complaint alleges in the abstract:

14

LRMPs in the Southern Rockies may adversely impact lynx and lynx habitat by: (1) having a fire exclusion policy which changes the vegetative mosaic maintained by natural disturbances; (2) allowing grazing of domestic livestock, which reduces forage for lynx prey; (3) allowing roads and winter recreation trails that facilitate access to historical lynx habitat by competitors; (4) allowing levels of human access via forest roads that may present a risk of incidental trapping or illegal shooting of lynx; (5) having limited direction in the Forest Plan pertaining to tree thinning and foraging habitat; and (6) having weak direction for distributing lynx habitat components across the landscape.

We do not disagree with the proposition that policies, directions, and allowances contained in a LRMP may indirectly impact the lynx and its habitat adversely. After all, these are matters contained within a LRMP on which agency actions are based. But this does not make such policies, directions, and allowances "action" requiring consultation within the meaning of §7(a)(2). Policies and directions only guide the Forest Service in determining whether an "action" may be properly undertaken consistent with the LRMP. Moreover, the fact that a LRMP "allows" certain activities to occur on forest lands does not commit the Forest Service to anything. See Plan Review, 58 Fed. Reg. at 19370 (citing cases); compare Norton, 542 U.S. at 72 (holding a land use plan's "statement to the effect that BLM will conduct 'Use Supervision and Monitoring' in designated areas–like other 'will do' projections of agency action set forth in land use plans–are not a legally binding commitment"). "[M]any activities allowed by Plans, such as timber harvest and road construction, are never carried out for a variety of reasons, such as funding limitations and environment, wildlife or policy considerations." Final Rule, 65 Fed. Reg. at 16079; compare Norton, 542 U.S. at 71. What LRMPs might "allow" is thus readily distinguishable from "actual actions as a result of past or current implementation of the Plans." Final Rule, 65

15

Fed. Reg. at 16079.[10]

Neither do provisions identifying specific areas as appropriate for certain uses that normally occur within a forest (*e.g.*, recreation, grazing, timber cutting, and the like) constitute "action" on the part of the Forest Service within the meaning of § 7(a)(2). The

---

[10] Most, if not all, activities which occur within a national forest require a permit, license, contract, lease, or other legal instrument. Of course, as the example in § 402.02's definition of "action" provides, the "granting" of such instruments constitutes "action" under § 7(a)(2). See 50 C.F.R. § 402.02. A guideline or policy in a LRMP stating that such instruments will be available under appropriate circumstances, however, does not constitute "action." In this regard, the Supreme Court's discussion of the LRMP in Ohio Forestry Ass'n. v. Sierra Club, 523 U.S. 726 (1998), is instructive. In that case, the Sierra Club challenged a LRMP on the basis that the plan permitted too much logging and clearcutting in purported violation of the NFMA, NEPA, and APA. The court specifically acknowledged that "[t]he Plan *permits* logging to take place on 126,000 (197 sq. mi.) of the federally owned acres." Id. at 729 (emphasis added). On review at the summary judgment stage, the Court nonetheless held the Sierra Club's challenge to the LRMP was not ripe for lack of any definitive harm arising from agency action:

> [T]he provisions of the Plan that the Sierra Club challenges do not create adverse effects of a strictly legal kind, that is effect of a sort that would have qualified as harm. . . . [T]hey do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations. Thus, for example, the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut.

> [B]efore the Forest Service can permit logging, it must focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court.

Id. at 733-34; compare 36 C.F.R. § 219.3(b); see also Lujan, 497 U.S. at 892-93 n. 3.

16

FWS regulation addressing "suitable uses" within a national forest specifically provides that identification of specific areas in a LRMP "is guidance for project and activity decisionmaking, is not a permanent land designation, and is subject to change through plan amendment or plan revision. Uses of specific areas are approved through project and activity decisionmaking." 36 C.F.R. § 219.12(a)(1).

A LRMP considered in isolation simply is not an ongoing, self-implementing document. Specific activities, programs, and/or projects are necessary to implement the plan. See, e.g., Bosworth, 443 F.3d at 737; Lamb, 265 F.3d at 1042. Those same activities, programs, and projects must be alleged in a complaint that seeks to establish an "acting" agency's duty to consult under § 7(a)(2) of the ESA. As we have explained, a LRMP *envisions* the forest will be used for multiple purposes, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). A plan or vision is certainly a precursor to "agency action," but neither is action requiring § 7(a)(2) consultation.

2.

The Ninth Circuit decision in Pacific Rivers does not persuade us otherwise. In that case, the National Marine Fisheries Service (NMFS) had listed the Snake River chinook salmon as "threatened" under the ESA. The basis for that suit was the Forest Service's failure to consult with the NMFS regarding the effects of certain LRMPs on the species. The court's description of LRMPs in that case was not unlike our description here. The court described LRMPs as–

17

establish[ing] forest-wide and area-specific standards and guidelines to which all projects must adhere . . . . The LRMPs identify lands suitable for timber production and other uses, and establish an allowable sale quantity of timber and production targets and schedules for forage, road construction, and other economic commodities. . . . Every resource plan, permit, contract, or any other document pertaining to the use of the forest must be consistent with the LRMP.

Pacific Rivers, 30 F.3d at1052. The court further referred to LRMPs as "establishing resource and land use policies" and "set[ting] forth criteria for harvesting resources[.]" Id. at 1055-56. Nonetheless, the court rejected as "incorrect" the Forest Service's argument that "LRMPs are not ongoing agency action throughout their duration." Id. at 1053. Rather, the Court concluded:

The LRMPs are comprehensive management plans governing a multitude of individual projects. Indeed, every individual project planned in both national forests involved in this case is implemented according to the LRMPs. Thus, because the LRMPs have an ongoing and long-lasting effect even after adoption, we hold that the LRMPs represent ongoing agency action.

Id.

Contrary to Pacific Rivers, our analysis makes painfully apparent that "standards," "guidelines," "policies," "criteria," "land designations," and the like appearing within a LRMP do not constitute "action" requiring consultation under § 7(a)(2) of the ESA. A contrary view would be the equivalent of saying that agency regulations constitute ongoing action because such regulations continually affect what goes on in the forest. Of course, the very definition of "action" in § 402.02 tells us that the *promulgation* of regulations," not the regulations themselves, constitutes "action." 50 C.F.R. § 402.02 (emphasis added). We have no quarrel with the proposition that LRMPs may have "an ongoing and long-lasting effect"

18

on the forest. That's the very purpose of a LRMP – to guide management decisions regarding the use of forest resources and to establish to a substantial degree what is permitted to occur within the forest. But this does not alter our conclusion that the entirety of LRMPs do not constitute § 7 "action." Instead, "activities or programs . . . authorized, funded, or carried out," by the Forest Service are the "action" of which § 7(a)(2) speaks. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02.[11] A LRMP simply does not fit within this definition.

### III.

What Forest Guardians seeks in this case is nothing short of a wholesale review of two LRMPs under the guise of § 7(a)(2) consultation. To be sure, demanding the Forest Service consult with FWS on the entirety of LRMPs for the Carson and Santa Fe National Forests, rather than on activities, programs, or projects approved consistent with those LRMPs, is

---

[11] Pacific Rivers' reliance on Tennesssee Valley Auth. v. Hill, 437 U.S. 153 (1978), to support its holding was wholly misplaced. See Pacific Rivers, 30 F.3d at 1054-55. Tennessee Valley did not address an issue even remotely similar to the question of whether a LRMP constitutes "action" under § 7(a)(2). All the justices agreed that a federal agency's placement of a virtually completed river dam into operation constituted action on the part of the agency, at least in the generic sense of the word. The question in that case was whether the ESA required enjoining the operation of a virtually completed dam where the dam might eradicate the snail darter, an endangered species of perch. The Court held that placing the dam into operation constituted action under the ESA, and let an injunction against its operation stand. The Court explained that "[i]t has not been shown, for example, how TVA can close the gates of the Tellico Dam without 'carrying out' an action that has been 'authorized' and 'funded' by a federal agency." Tennessee Valley, 437 U.S. at 173. We disagree with Pacific Rivers' view that the argument the agency made in Tennessee Valley – that the ESA did not apply to programs and activities virtually completed before the listing of a species – was the same argument the NMFS made in that case – that LRMPs were not ongoing agency action under the ESA. See Pacific Rivers, 30 F.3d at 1055.

simpler and more cost effective for Forest Guardians.[12]   Efficiency and systemic improvement by wholesale correction, however, cannot justify skirting the "agency action" requisite to § 7(a)(2) consultation.  See Lujan, 497 U.S. at 893-94.  The approach the ESA requires "is understandably frustrating to an organization . . . which has as its objective across-the-board protection of our Nation's wildlife . . . .  But this is the traditional, and remains the normal, mode of operation by the courts."  Id. at 894.

Although we must assume Forest Guardians can prove all of the facts alleged in its amended complaint, its allegation that "[i]mplementation of the Carson and Santa Fe National Forest LRMPs are 'agency actions'" within the meaning of § 7(a)(2) of the ESA is a legal conclusion that we need not accept.  When reviewing the district court's grant of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.  Because Forest Guardians has not alleged any activity, project, or program authorized, funded, or carried out by the Forest Service that might constitute "action" within § 7(a)(2) of the ESA, the Forest Service has no

---

[12]  As illustrated by the Forest Service's voluntary consultation with FWS on LRMPs covering a number of national forests within the fourteen State listing of the Canada Lynx, see supra n.4, consultation between the Forest Service and the FWS on how LRMP's in the region might be amended to best protect the lynx may well be more prudent in some instances than prolonged litigation on the question of whether individualized agency actions threaten the lynx.  See generally Biological Assessment of the Effects of National Forest Land and Resource Management Plans and Bureau of Land Management Land Use Plans on Canada Lynx (1999), http://www.fs.fed.us/r1/planning/lynx/reports/ba/ba.pdf.  But what is prudent is not necessarily what is legally required.

20

duty to consult with the FWS pursuant to the statute.  Because Forest Guardians' amended complaint is not actionable, the judgment of the district court is–

AFFIRMED.