NORTON, SECRETARY OF THE INTERIOR, ET AL. *v.*
SOUTHERN UTAH WILDERNESS ALLIANCE ET AL.

No. 03–101.   Argued March 29, 2004—Decided June 14, 2004

*Deputy Solicitor General Kneedler* argued the cause for petitioners.  With him on the briefs were *Solicitor General Olson, Assistant Attorney General Sansonetti, Deputy Assistant Attorney General Clark, Barbara McDowell, An-*

drew Mergen, John A. Bryson, Susan Pacholski, and Roderick E. Walston.

Paul M. Smith argued the cause for respondents. With him on the brief for respondents Southern Utah Wilderness Alliance et al. were Jerome L. Epstein, William M. Hohengarten, Elaine J. Goldenberg, Stephen H. M. Bloch, James S. Angell, Patti Goldman, and Todd D. True. Paul A. Turcke and Paul W. Mortensen filed a brief for respondents Utah Shared Access Alliance et al.*

JUSTICE SCALIA delivered the opinion of the Court.

In this case, we must decide whether the authority of a federal court under the Administrative Procedure Act (APA) to "compel agency action unlawfully withheld or unreasonably delayed," 5 U. S. C. § 706(1), extends to the review of the United States Bureau of Land Management's stewardship of

---

*Robin L. Rivett filed a brief for the Pacific Legal Foundation as amicus curiae urging reversal.

Briefs of amici curiae urging affirmance were filed for the State of California et al. by Bill Lockyer, Attorney General of California, Manuel Medeiros, Solicitor General, Richard Frank, Chief Deputy Attorney General, William Brieger, Acting Chief Assistant Attorney General, Theodora Berger, Senior Assistant Attorney General, Ken Alex and Craig Thompson, Supervising Deputy Attorneys General, and Susan Durbin and James Potter, Deputy Attorneys General, and by the Attorneys General for their respective States as follows: Ken Salazar of Colorado, Richard Blumenthal of Connecticut, Lisa Madigan of Illinois, Thomas F. Reilly of Massachusetts, Jeremiah W. (Jay) Nixon of Missouri, Mike McGrath of Montana, Brian Sandoval of Nevada, Patricia Madrid of New Mexico, Eliot Spitzer of New York, W. A. Drew Edmondson of Oklahoma, Hardy Myers of Oregon, Larry Long of South Dakota, and Peggy A. Lautenschlager of Wisconsin; for the Defenders of Wildlife et al. by Katherine A. Meyer and Eric R. Glitzenstein; for the Montana Wilderness Association by Jack R. Tuholske; for the National Organization of Veterans' Advocates by Daniel D. Wedemeyer; for the Natural Resources Defense Council et al. by Charles E. Koob and Johanna H. Wald; for Robert W. Adler et al. by Robert G. Dreher; and for Russell Train et al. by Nicholas C. Yost and Gary Widman.

public lands under certain statutory provisions and its own planning documents.

## I

· Almost half the State of Utah, about 23 million acres, is federal land administered by the Bureau of Land Management (BLM), an agency within the Department of Interior. For nearly 30 years, BLM's management of public lands has been governed by the Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2744, 43 U. S. C. § 1701 *et seq.*, which "established a policy in favor of retaining public lands for multiple use management." *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 877 (1990). "Multiple use management" is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, "including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values." 43 U. S. C. § 1702(c). A second management goal, "sustained yield," requires BLM to control depleting uses over time, so as to ensure a high level of valuable uses in the future. § 1702(h). To these ends, FLPMA establishes a dual regime of inventory and planning. Sections 1711 and 1712, respectively, provide for a comprehensive, ongoing inventory of federal lands, and for a land use planning process that "project[s]" "present and future use," § 1701(a)(2), given the lands' inventoried characteristics.

Of course not all uses are compatible. Congress made the judgment that some lands should be set aside as wilderness at the expense of commercial and recreational uses. A pre-FLPMA enactment, the Wilderness Act of 1964, 78 Stat. 890, provides that designated wilderness areas, subject to certain exceptions, "shall [have] no commercial enterprise and no permanent road," no motorized vehicles, and no manmade structures. ·16 U. S. C. § 1133(c). The designation of a wil-

derness area can be made only by Act of Congress, see 43 U. S. C. § 1782(b).

Pursuant to § 1782, the Secretary of the Interior (Secretary) has identified so-called "wilderness study areas" (WSAs), roadless lands of 5,000 acres or more that possess "wilderness characteristics," as determined in the Secretary's land inventory. § 1782(a); see 16 U. S. C. § 1131(c). As the name suggests, WSAs (as well as certain wild lands identified prior to the passage of FLPMA) have been subjected to further examination and public comment in order to evaluate their suitability for designation as wilderness. In 1991, out of 3.3 million acres in Utah that had been identified for study, 2 million were recommended as suitable for wilderness designation. 1 U. S. Dept. of Interior, BLM, Utah Statewide Wilderness Study Report 3 (Oct. 1991). This recommendation was forwarded to Congress, which has not yet acted upon it. Until Congress acts one way or the other, FLPMA provides that "the Secretary shall continue to manage such lands . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness." 43 U. S. C. § 1782(c). This nonimpairment mandate applies to all WSAs identified under § 1782, including lands considered unsuitable by the Secretary. See §§ 1782(a), (b); App. 64 (BLM Interim Management Policy for Lands Under Wilderness Review).

Aside from identification of WSAs, the main tool that BLM employs to balance wilderness protection against other uses is a land use plan—what BLM regulations call a "resource management plan." 43 CFR § 1601.0–5(k) (2003). Land use plans, adopted after notice and comment, are "designed to guide and control future management actions," § 1601.0–2. See 43 U. S. C. § 1712; 43 CFR § 1610.2 (2003). Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps. § 1601.0–5(k). Under FLPMA, "[t]he Secretary shall manage the public lands under principles of multiple use and sus-

tained yield, in accordance with the land use plans . . . when they are available." 43 U. S. C. § 1732(a).

Protection of wilderness has come into increasing conflict with another element of multiple use, recreational use of so-called off-road vehicles (ORVs), which include vehicles primarily designed for off-road use, such as lightweight, four-wheel "all-terrain vehicles," and vehicles capable of such use, such as sport utility vehicles. See 43 CFR § 8340.0–5(a) (2003). According to the United States Forest Service's most recent estimates, some 42 million Americans participate in off-road travel each year, more than double the number two decades ago. H. Cordell, Outdoor Recreation for 21st Century America 40 (2004). United States sales of all-terrain vehicles alone have roughly doubled in the past five years, reaching almost 900,000 in 2003. See Tanz, Making Tracks, Making Enemies, N. Y. Times, Jan. 2, 2004, p. F1, col. 5; Discover Today's Motorcycling, Motorcycle Industry Council, Press Release (Feb. 13, 2004), http:// www.motorcycles.org (all Internet materials as visited June 4, 2004, and available in Clerk of Court's case file). The use of ORVs on federal land has negative environmental consequences, including soil disruption and compaction, harassment of animals, and annoyance of wilderness lovers. See Brief for Natural Resources Defense Council et al. as *Amici Curiae* 4–7, and studies cited therein. Thus, BLM faces a classic land use dilemma of sharply inconsistent uses, in a context of scarce resources and congressional silence with respect to wilderness designation.

In 1999, respondents Southern Utah Wilderness Alliance and other organizations (collectively SUWA) filed this action in the United States District Court for Utah against petitioners BLM, its Director, and the Secretary. In its second amended complaint, SUWA sought declaratory and injunctive relief for BLM's failure to act to protect public lands in Utah from damage caused by ORV use. SUWA made three claims that are relevant here: (1) that BLM had violated its

nonimpairment obligation under § 1782(c) by allowing degradation in certain WSAs; (2) that BLM had failed to implement provisions in its land use plans relating to ORV use; and (3) that BLM had failed to take a "hard look" at whether, pursuant to the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*, it should undertake supplemental environmental analyses for areas in which ORV use had increased. SUWA contended that it could sue to remedy these three failures to act pursuant to the APA's provision of a cause of action to "compel agency action unlawfully withheld or unreasonably delayed." 5 U. S. C. § 706(1).

The District Court entered a dismissal with respect to the three claims. A divided panel of the Tenth Circuit reversed. 301 F. 3d 1217 (2002). The majority acknowledged that under § 706(1), "federal courts may order agencies to act only where the agency fails to carry out a mandatory, nondiscretionary duty." *Id.*, at 1226. It concluded, however, that BLM's nonimpairment obligation was just such a duty, and therefore BLM could be compelled to comply. Under similar reasoning, it reversed the dismissal with respect to the land use plan claim; and likewise reversed dismissal of the NEPA claim. We granted certiorari. 540 U. S. 980 (2003).

## II

All three claims at issue here involve assertions that BLM failed to take action with respect to ORV use that it was required to take. Failures to act are sometimes remediable under the APA, but not always. We begin by considering what limits the APA places upon judicial review of agency inaction.

The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U. S. C. § 702. Where no other statute provides a private right of action, the "agency action" complained

of must be *"final* agency action." § 704 (emphasis added). "[A]gency action" is defined in § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act."* (Emphasis added.) The APA provides relief for a failure to act in § 706(1): "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."

Sections 702, 704, and 706(1) all insist upon an "agency action," either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1)). The definition of that term begins with a list of five categories of decisions made or outcomes implemented by an agency—"agency rule, order, license, sanction [or] relief." § 551(13). All of those categories involve circumscribed, discrete agency actions, as their definitions make clear: "an agency statement of . . . future effect designed to implement, interpret, or prescribe law or policy" (rule); "a final disposition . . . in a matter other than rule making" (order); a "permit . . . or other form of permission" (license); a "prohibition . . . or . . . taking [of] other compulsory or restrictive action" (sanction); or a "grant of money, assistance, license, authority," etc., or "recognition of a claim, right, immunity," etc., or "taking of other action on the application or petition of, and beneficial to, a person" (relief). §§ 551(4), (6), (8), (10), (11).

The terms following those five categories of agency action are not defined in the APA: "or the equivalent or denial thereof, or failure to act." § 551(13). But an "equivalent . . . thereof" must also be discrete (or it would not be equivalent), and a "denial thereof" must be the denial of a discrete listed action (and perhaps denial of a discrete equivalent).

The final term in the definition, "failure to act," is in our view properly understood as a failure to take an *agency action*—that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13). Moreover, even without this equation of "act" with "agency

action" the interpretive canon of *ejusdem generis* would attribute to the last item ("failure to act") the same characteristic of discreteness shared by all the preceding items. See, *e. g., Washington State Dept. of Social and Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U. S. 371, 384–385 (2003). A "failure to act" is not the same thing as a "denial." The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request—for example, the failure to promulgate a rule or take some decision by a statutory deadline. The important point is that a "failure to act" is properly understood to be limited, as are the other items in § 551(13), to a *discrete* action.

A second point central to the analysis of the present case is that the only agency action that can be compelled under the APA is action legally *required.* This limitation appears in § 706(1)'s authorization for courts to "compel agency action *unlawfully* withheld."[1] (Emphasis added.) In this regard the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs—principally writs of mandamus under the All Writs Act, now codified at 28 U. S. C. § 1651(a). The mandamus remedy was normally limited to enforcement of "a specific, unequivocal command," *ICC* v. *New York, N. H. & H. R. Co.*, 287 U. S. 178, 204 (1932), the ordering of a " 'precise, definite act . . . about which [an official] had no discretion whatever,' " *United States ex rel. Dunlap* v. *Black*, 128 U. S. 40, 46 (1888) (quoting *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524, 613 (1838)). See also *ICC* v. *United States ex rel. Humboldt S. S. Co.*, 224 U. S. 474, 484 (1912). As described in the Attorney General's Manual on the APA, a document whose reasoning we have often found persuasive, see, *e. g., Darby* v. *Cisneros*, 509

---

[1] Of course § 706(1) also authorizes courts to "compel agency action . . . unreasonably delayed"—but a delay cannot be unreasonable with respect to action that is not required.

U. S. 137, 148, n. 10 (1993); *Chrysler Corp.* v. *Brown,* 441 U. S. 281, 302, n. 31 (1979); *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U. S. 519, 546 (1978), § 706(1) empowers a court only to compel an agency "to perform a ministerial or non-discretionary act," or "to take action upon a matter, without directing *how* it shall act." Attorney General's Manual on the Administrative Procedure Act 108 (1947) (emphasis added). See also L. Jaffe, Judicial Control of Administrative Action 372 (1965); K. Davis, Administrative Law § 257, p. 925 (1951).

Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.* These limitations rule out several kinds of challenges. The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan* v. *National Wildlife Federation,* 497 U. S. 871 (1990). There we considered a challenge to BLM's land withdrawal review program, couched as unlawful agency "action" that the plaintiffs wished to have "set aside" under § 706(2).[2] *Id.,* at 879. We concluded that the program was not an "agency action":

> "[R]espondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." *Id.,* at 891 (emphasis in original).

---

[2] Title 5 U. S. C. § 706(2) provides, in relevant part:
"The reviewing court shall—

"(2) hold unlawful and set aside agency action . . . found to be—
"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."

The plaintiffs in *National Wildlife Federation* would have fared no better if they had characterized the agency's alleged "failure to revise land use plans in proper fashion" and "failure to consider multiple use," *ibid.*, in terms of "agency action unlawfully withheld" under § 706(1), rather than agency action "not in accordance with law" under § 706(2).

The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law). Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be. For example, 47 U. S. C. § 251(d)(1), which required the Federal Communications Commission "to establish regulations to implement" interconnection requirements "[w]ithin 6 months" of the date of enactment of the Telecommunications Act of 1996, would have supported a judicial decree under the APA requiring the prompt issuance of regulations, but not a judicial decree setting forth the content of those regulations.

## III

### A

With these principles in mind, we turn to SUWA's first claim, that by permitting ORV use in certain WSAs, BLM violated its mandate to "continue to manage [WSAs] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness," 43 U. S. C. § 1782(c). SUWA relies not only upon § 1782(c) but also upon a provision of BLM's Interim Management Policy for Lands Under Wilderness Review, which interprets the nonimpairment mandate to require BLM to manage WSAs so as to prevent them from being "degraded so far, compared with the area's values for other purposes, as to significantly constrain the Congress's

prerogative to either designate [it] as wilderness or release it for other uses." App. 65.

Section 1782(c) is mandatory as to the object to be achieved, but it leaves BLM a great deal of discretion in deciding how to achieve it. It assuredly does not mandate, with the clarity necessary to support judicial action under § 706(1), the total exclusion of ORV use.

SUWA argues that § 1782 *does* contain a categorical imperative, namely, the command to comply with the nonimpairment mandate. It contends that a federal court could simply enter a general order compelling compliance with that mandate, without suggesting any particular manner of compliance. It relies upon the language from the Attorney General's Manual quoted earlier, that a court can "take action upon a matter, without directing how [the agency] shall act," and upon language in a case cited by the Manual noting that "mandamus will lie . . . even though the act required involves the exercise of judgment and discretion," *Safeway Stores, Inc.* v. *Brown*, 138 F. 2d 278, 280 (Emerg. Ct. App. 1943). The action referred to in these excerpts, however, is *discrete* agency action, as we have discussed above. General deficiencies in compliance, unlike the failure to issue a ruling that was discussed in *Safeway Stores*, lack the specificity requisite for agency action.

The principal purpose of the APA limitations we have discussed—and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the

broad statutory mandate, injecting the judge into day-to-day agency management. To take just a few examples from federal resources management, a plaintiff might allege that the Secretary had failed to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance," or to "manage the [New Orleans Jazz National] [H]istorical [P]ark in such a manner as will preserve and perpetuate knowledge and understanding of the history of jazz," or to "manage the [Steens Mountain] Cooperative Management and Protection Area for the benefit of present and future generations." 16 U. S. C. §§ 1333(a), 410bbb–2(a)(1), 460nnn–12(b). The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

## B

SUWA's second claim is that BLM failed to comply with certain provisions in its land use plans, thus contravening the requirement that "[t]he Secretary shall manage the public lands . . . in accordance with the land use plans . . . when they are available." 43 U. S. C. § 1732(a); see also 43 CFR § 1610.5–3(a) (2003) ("All future resource management authorizations and actions . . . and subsequent more detailed or specific planning, shall conform to the approved plan"). The relevant count in SUWA's second amended complaint alleged that BLM had violated a variety of commitments in its land use plans, but over the course of the litigation these have been reduced to two, one relating to the 1991 resource management plan for the San Rafael area, and the other to various aspects of the 1990 ORV implementation plan for the Henry Mountains area.

The actions contemplated by the first of these alleged commitments (completion of a route designation plan in the San Rafael area), and by one aspect of the second (creation of "use supervision files" for designated areas in the Henry

Mountains area) have already been completed,[3] and these claims are therefore moot. There remains the claim, with respect to the Henry Mountains plan, that "in light of damage from ORVs in the Factory Butte area," a sub-area of Henry Mountains open to ORV use, "the [plan] obligated BLM to conduct an intensive ORV monitoring program." Brief for SUWA 7–8. This claim is based upon the plan's statement that the Factory Butte area "will be monitored and closed if warranted." App. 140. SUWA does not contest BLM's assertion in the court below that informal monitoring has taken place for some years, see Brief for Appellee Secretary of Interior et al. in No. 01–4009 (CA10), p. 23, but it demands continuing implementation of a monitoring *program*. By this it apparently means to insist upon adherence to the plan's general discussion of "Use Supervision and Monitoring" in designated areas, App. 148–149, which (in addition to calling for the use supervision files that have already been created) provides that "[r]esource damage will be documented and recommendations made for corrective action," "[m]onitoring in open areas will focus on determining damage which may necessitate a change in designation," and "emphasis on use supervision will be placed on [limited and closed areas]." *Id.*, at 149. SUWA acknowledges that a monitoring program has recently been *commenced*. Brief for SUWA 12. In light, however, of the continuing action

---

[3] See U. S. Dept. of Interior, BLM, San Rafael Route Designation Plan (2003), http://www.ut.blm.gov/sanrafaelohv/wtheplan.htm; 3 App. to Brief for Appellants in No. 01–4009 (CA10), p. 771 (declaration of manager for relevant BLM field office, noting the establishment of monitoring files for the Henry Mountains area); Brief for Respondent SUWA et al. 12 (hereinafter Brief for SUWA) (acknowledging completion of these actions).

It is arguable that the complaint sought not merely creation but continuing maintenance of use supervision files, in which case (for the reasons set forth with respect to the ORV monitoring program later in text) that claim would not be moot. If so, what we say below with regard to the merits of the ORV monitoring claim would apply equally to the use supervision file claim.

that existence of a "program" contemplates, and in light of BLM's contention that the program cannot be compelled under § 706(1), this claim cannot be considered moot.

The statutory directive that BLM manage "in accordance with" land use plans, and the regulatory requirement that authorizations and actions "conform to" those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan. Unless and until the plan is amended, such actions can be set aside as contrary to law pursuant to 5 U. S. C. § 706(2). The claim presently under discussion, however, would have us go further, and conclude that a statement in a plan that BLM "will" take this, that, or the other action, is a binding commitment that can be compelled under § 706(1). In our view it is not—at least absent clear indication of binding commitment in the terms of the plan.

FLPMA describes land use plans as tools by which "present and future use is *projected*." 43 U. S. C. § 1701(a)(2) (emphasis added). The implementing regulations make clear that land use plans are a preliminary step in the overall process of managing public lands—"designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 CFR § 1601.0–2 (2003). The statute and regulations confirm that a land use plan is not ordinarily the medium for affirmative decisions that implement the agency's "project[ions]."[4] Title 43 U. S. C. § 1712(e) provides that "[t]he Secretary may issue management decisions to implement land use plans"—the decisions, that is, are distinct from the plan itself. Picking up the same theme, the regula-

---

[4] The exceptions "are normally limited to those required by regulation, such as designating [ORV] areas, roads, and trails (see 43 CFR 8342)." U. S. Dept. of Interior, BLM, Land Use Planning Handbook II–2 (2000) (hereinafter Handbook). See, *e. g.,* U. S. Dept. of Interior, BLM, San Rafael Final Resource Management Plan 63 (1991) (hereinafter San Rafael Plan) (available at http://www.ut.blm.gov/planning/OTHERS/SRARMP-ROD%20MAY%201991.pdf).

tion defining a land use plan declares that a plan "is not a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and regulations." 43 CFR § 1601.0–5(k) (2003). The BLM's Land Use Planning Handbook specifies that land use plans are normally not used to make site-specific implementation decisions. See Handbook II–2.

Plans also receive a different agency review process from implementation decisions. Appeal to the Department's Board of Land Appeals is available for "a specific action being proposed to implement some portion of a resource management plan or amendment." 43 CFR § 1610.5–3(b) (2003). However, the Board, which reviews "decisions rendered by Departmental officials relating to . . . [t]he use and disposition of public lands and their resources," § 4.1(b)(3)(i), does not review the approval of a plan, since it regards a plan as a policy determination, not an implementation decision. See, e. g., Wilderness Society, 109 I. B. L. A. 175, 178 (1989); Wilderness Society, 90 I. B. L. A. 221, 224 (1986); see also Handbook II–2, IV–3. Plans are protested to the BLM director, not appealed.

The San Rafael plan provides an apt illustration of the immense scope of projected activity that a land use plan can embrace. Over 100 pages in length, it presents a comprehensive management framework for 1.5 million acres of BLM-administered land. Twenty categories of resource management are separately discussed, including mineral extraction, wilderness protection, livestock grazing, preservation of cultural resources, and recreation. The plan lays out an ambitious agenda for the preparation of additional, more detailed plans and specific next steps for implementation. Its introduction notes that "[a]n [ORV] implementation plan is scheduled to be prepared within 1 year following approval of the [San Rafael plan]." San Rafael Plan 9. Similarly "scheduled for preparation" are activity plans for certain environmentally sensitive areas, "along with allotment man-

agement plans, habitat management plans, a fire management plan, recreation management plans . . . , cultural resource management plans for selected sites, watershed activity plans, and the wild and scenic river management plan." *Ibid.* The projected schedule set forth in the plan shows "[a]nticipated [i]mplementation" of some future plans within one year, others within three years, and still others, such as certain recreation and cultural resource management plans, at a pace of "one study per fiscal year." *Id.*, at 95–102.

Quite unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them. It would be unreasonable to think that either Congress or the agency intended otherwise, since land use plans nationwide would commit the agency to actions far in the future, for which funds have not yet been appropriated. Some plans make explicit that implementation of their programmatic content is subject to budgetary constraints. See Brief for Petitioners 42–43, and n. 18 (quoting from such plans). While the Henry Mountains plan does not contain such a specification, we think it must reasonably be implied. A statement by BLM about what it plans to do, at some point, provided it has the funds and there are not more pressing priorities, cannot be plucked out of context and made a basis for suit under § 706(1).

Of course, an action called for in a plan may be compelled when the plan merely reiterates duties the agency is already obligated to perform, or perhaps when language in the plan itself creates a commitment binding on the agency. But allowing general enforcement of plan terms would lead to pervasive interference with BLM's own ordering of priorities. For example, a judicial decree compelling immediate preparation of all of the detailed plans called for in the San Rafael plan would divert BLM's energies from other projects throughout the country that are in fact more pressing. And

while such a decree might please the environmental plaintiffs in the present case, it would ultimately operate to the detriment of sound environmental management. Its predictable consequence would be much vaguer plans from BLM in the future—making coordination with other agencies more difficult, and depriving the public of important information concerning the agency's long-range intentions.

We therefore hold that the Henry Mountains plan's statements to the effect that BLM will conduct "Use Supervision and Monitoring" in designated areas—like other "will do" projections of agency action set forth in land use plans—are not a legally binding commitment enforceable under § 706(1). That being so, we find it unnecessary to consider whether the action envisioned by the statements is sufficiently discrete to be amenable to compulsion under the APA.[5]

## IV

Finally, we turn to SUWA's contention that BLM failed to fulfill certain obligations under NEPA. Before addressing whether a NEPA-required duty is actionable under the APA, we must decide whether NEPA creates an obligation in the first place. NEPA requires a federal agency to prepare an environmental impact statement (EIS) as part of any "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U. S. C. § 4332(2)(C). Often an initial EIS is sufficient, but in certain circumstances an EIS must be supplemented. See *Marsh* v. *Oregon Natural Resources Council,* 490 U. S. 360, 370–374 (1989). A regulation of the Council on Environmental Quality requires supplementation where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 CFR § 1502.9(c)(1)(ii) (2003). In *Marsh,*

---

[5] We express no view as to whether a court could, under § 706(1), enforce a duty to monitor ORV use imposed by a BLM regulation, see 43 CFR § 8342.3 (2003). That question is not before us.

we interpreted § 4332 in light of this regulation to require an agency to take a "hard look" at the new information to assess whether supplementation might be necessary. 490 U. S., at 385; see *id.*, at 378–385.

SUWA argues that evidence of increased ORV use is "significant new circumstances or information" that requires a "hard look." We disagree. As we noted in *Marsh*, supplementation is necessary only if "there remains 'major Federal actio[n]' to occur," as that term is used in § 4332(2)(C). *Id.*, at 374. In *Marsh*, that condition was met: The dam construction project that gave rise to environmental review was not yet completed. Here, by contrast, although the *"[a]pproval* of a [land use plan]" is a "major Federal action" requiring an EIS, 43 CFR § 1601.0–6 (2003) (emphasis added), that action is completed when the plan is approved. The land use plan is the "proposed action" contemplated by the regulation. There is no ongoing "major Federal action" that could require supplementation (though BLM *is* required to perform additional NEPA analyses if a plan is amended or revised, see §§ 1610.5–5, 5–6).

\*       \*       \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*