RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re:  SCOTT HOWARD,

                        *Petitioner.*

_____

HILDA S. SOLIS, Secretary, United States
Department of Labor,

                        *Respondent.*

No. 08-5799

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 08-00057—Karen K. Caldwell, District Judge.

Argued:  April 29, 2009

Decided and Filed:  July 6, 2009

Before:  GUY, ROGERS, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Stephen A. Sanders, APPALACHIAN CITIZENS LAW CENTER, Whitesburg, Kentucky, for Petitioner.  Edward Waldman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent.  **ON BRIEF:**  Stephen A. Sanders, APPALACHIAN CITIZENS LAW CENTER, Whitesburg, Kentucky, Nathan J. Fetty, APPALACHIAN CENTER FOR THE ECONOMY AND THE ENVIRONMENT, Buckhannon, West Virginia, for Petitioner.  Edward Waldman, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent.  Thomas C. Means, Daniel W. Wolff, CROWELL & MORING LLP, Washington, D.C., for Amicus Curiae.

_____

## OPINION

_____

ROGERS, Circuit Judge.   Petitioner Scott Howard, a miner, seeks a writ of mandamus from this court directing the Secretary of Labor to promulgate lower limits for the amount of dust and silica in the air in mines.  The Federal Mine Safety and Health Act

1

of 1977 authorizes the Secretary to promulgate mandatory air quality standards for U.S. mines.  The Secretary has not promulgated new standards for dust and silica since 1980. Howard argues that the present standards are too high and that the Secretary has, therefore, violated her duty under the Mine Act to promulgate "improved" standards to protect the health of miners.  Because Howard must first exhaust his administrative remedies as required by the Mine Act, however, his petition must be dismissed.

**I.**

Howard works as a coal miner in Eastern Kentucky, and has done so since 1979. Howard developed black lung disease, which can be caused by the inhalation of coal mine dust and silica dust.  Black lung is a generic term, used to describe a group of lung diseases including pneumoconiosis, silicosis, anthracosis, and progressive massive fibrosis.

The Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. §§ 801 *et seq.*, governs the safety and inspection of U.S. mines.  The Act requires the Secretary of Labor "to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal or other miners."  Mine Act § 2(g)(1), 30 U.S.C. § 801(g)(1).[1]  Such standards include national limits on the amount of respirable coal mine dust and respirable silica allowable in mine atmospheres, also called permissible exposure limits (PELs).  The standards set by the Secretary must "most adequately assure on the basis of the best available evidence that no miner will suffer material impairment of health or functional capacity even if such miner has regular exposure to the hazards dealt with by such standard for the period of his working life."  *Id.* § 101(a)(6)(A), 30 U.S.C. § 811(a)(6)(A).  The Mine Safety and Health Administration (MSHA), within the Department of Labor, oversees the administration of these provisions on the Secretary's behalf.  29 U.S.C. § 557a.

The Mine Act directs the Secretary to promulgate permanent PELs.  Mine Act § 101(a), 30 U.S.C. § 811(a) ("The Secretary shall . . . .").  However, once a PEL is

---

[1]The Mine Act amended the Federal Coal Mine Health and Safety Act of 1969, Pub. L. No. 91-173, 83 Stat. 742.

promulgated, the statute gives the Secretary discretion whether to promulgate a new PEL:

> Whenever the Secretary . . . *determines that a rule should be promulgated* in order to serve the objectives of this Act, the Secretary may request the recommendation of an advisory committee appointed under section 102(c). . . . When the Secretary receives a recommendation, accompanied by appropriate criteria, from the National Institute for Occupational Safety and Health [(NIOSH)][2] that a rule be promulgated, modified, or revoked, the Secretary must, within 60 days after receipt thereof, refer such recommendation to an advisory committee pursuant to this paragraph, or publish such as a proposed rule pursuant to paragraph (2), *or publish in the Federal Register his determination not to do so, and his reasons therefore*.

*Id.* § 101(a)(1), 30 U.S.C. § 811(a)(1) (emphasis added).

The Mine Act also provides the Secretary with discretion to promulgate emergency temporary standards (ETSs), which have immediate effect until a permanent standard is passed. *Id.* § 101(b)(1), 30 U.S.C. § 811(b)(1). An ETS can be promulgated if the Secretary concludes: "(A) that miners are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful, or to other hazards, and (B) that such emergency standard is necessary to protect miners from such danger." *Id.* Within nine months of promulgating an ETS, the Secretary must replace it with a permanent PEL. *Id.* § 101(b)(3), 30 U.S.C. § 811(b)(3).

Congress set the initial PELs for the amount of respirable dust and respirable silica. Mine Act §§ 202(b), 205, 30 U.S.C. §§ 842(b), 845. The initial PEL for respirable dust was 3.0 milligrams of respirable dust per cubic meter of air ($3.0 \text{ mg/m}^3$), computed as the average concentration of respirable dust in the mine during each shift. *Id.* § 202(b)(1), 30 U.S.C. § 842(b)(1). The Mine Act required that the PEL be reduced to $2.0 \text{ mg/m}^3$ within three years of enactment. *Id*. § 202(b)(2), 30 U.S.C. § 842(b)(2). The Act did not set a separate PEL for respirable silica. *Id.* § 205, 30 U.S.C. § 845. Rather, if coal mine dust contains more than five percent silica, the mine operator must

---

[2]NIOSH is a subdivision of the Center for Disease Control, which is part of the Department of Health and Human Services (HHS). NIOSH researches and advises on how to prevent injury and illness in the workplace. 29 U.S.C. § 671.

reduce the amount of respirable dust according to a schedule. *Id.* The initial PELs remained in effect until superseded by permanent standards promulgated by the Secretary. *Id.* §§ 202(b), 205, 30 U.S.C. §§ 842(b), 845. The Mine Act also required HHS to submit to the Secretary a schedule for reducing the respirable dust PEL to a level that "will prevent new incidences of respiratory disease and the further development of such disease in any person." *Id.* § 202(d), 30 U.S.C. § 842(d).

The Secretary adopted the first and only permanent PEL for respirable dust in 1980. 30 C.F.R. § 70.100(a). That PEL was 2.0 mg/m$^3$, the standard that the Mine Act required be adopted within three years of the Act's passage. 30 U.S.C. § 842(b). The Secretary has not created a separate PEL for respirable silica. Rather, a formula is used to determine the maximum respirable silica exposure level, and the computation is based on the respirable dust standard. This formula creates an "effective" PEL for respirable silica of .1 mg/m$^3$.

Although new PELs have not been promulgated, the agencies have discussed new standards for fourteen years. In November 1995, NIOSH recommended that the Secretary consider reducing the respirable dust PEL by half to 1.0 mg/m$^3$ and create a separate PEL for silica set at .05 mg/m$^3$, half the level of the "effective" PEL for respirable silica. MSHA stated that it would respond to the recommendations by proposing a rule, but deferred rulemaking until it received a report from a Department of Labor internal advisory committee, established by the Secretary under 30 U.S.C. § 812(c) to review this issue. In November 1996, that committee submitted a report to the Secretary with several recommendations about increasing compliance with the existing limits, but the report did not recommend lowering the respirable dust or respirable silica PELs. The committee did recommend that a separate PEL for respirable silica be created, although it did not specifically recommend that a separate silica PEL be lower than the "effective" PEL of .1 mg/m$^3$.

In response to these recommendations, MSHA added the development of lower PELs for both respirable dust and respirable silica to its 1998 regulatory agenda. These objectives remained on the regulatory agenda for several years. In 2001, MSHA

withdrew the objective of establishing a separate PEL for respirable silica because of "resource constraints" and "changing safety and health regulatory practices." In 2002, MSHA withdrew the objective of establishing a lower respirable dust PEL because MSHA was "developing regulatory alternatives." Both items returned to the MSHA's regulatory agenda: the separate respirable silica PEL in 2004 and the lower respirable dust PEL in 2008.

The Secretary, however, has not initiated rulemaking for new PELs. The Secretary pursued other regulatory avenues to increase compliance with the present PELs and the identification of lung diseases in miners.

Howard filed a mandamus petition in the district court under 28 U.S.C. § 1361, seeking a writ directing the Secretary to promulgate ETSs and final PELs at the levels recommended by NIOSH in 1995. Howard alleged that because the Secretary has failed to promulgate lower limits, Howard is forced to work in a dangerous and unhealthy environment. Howard also included a claim under the Administrative Procedure Act (APA), 5 U.S.C. § 706(1), that the agency's action was withheld or unreasonably delayed. The Secretary moved to dismiss the case under Fed. R. Civ. P. 12(b)(1), on the ground that "[t]he Mine Act, in conjunction with the All Writs Act, vests exclusive jurisdiction in the Courts of Appeals over claims that the Secretary has improperly withheld or unreasonably delayed promulgation of a mandatory standard." In lieu of dismissal, the district court transferred the case to the Sixth Circuit, pursuant to 28 U.S.C. § 1631.

**II.**

The district court properly transferred the case to this court because jurisdiction for the judicial review sought by Howard lies in this court. In this regard, we follow the thoughtful holdings of the District of Columbia Circuit, which has exercised jurisdiction to review directly agency delays in promulgating PELs under the Mine Act. *See Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor* (*UMWA*), 358 F.3d 40, 42 (D.C. Cir. 2004); *Oil, Chem. & Atomic Workers Int'l Union v. Zeeger* (*OCAW*), 768 F.2d 1480, 1485 (D.C. Cir. 1985). As the D.C. Circuit reasoned, "under the All Writs Act,

28 U.S.C. § 1651(a), [the court of appeals has] the authority to compel agency action unreasonably withheld or delayed if the putative agency action, once forthcoming, would be reviewable in [that] Court." *UMWA*, 358 F.3d at 42. Although neither case involved the agency's failure to act altogether, the application of the Mine Act in this case is not distinguishable from review where promulgation of a PEL was allegedly unreasonably delayed, *OCAW*, 768 F.2d at 1485-86, or a proposed PEL was allegedly improperly withdrawn, *UMWA*, 358 F.3d at 42.

The putative agency action in this case, promulgation of PELs, is unquestionably reviewable in this court. When the Secretary issues a PEL, the Mine Act requires that any challenges to the PEL be filed only in the court of appeals. Mine Act § 102(d), 30 U.S.C. § 811(d). "Because the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction." *OCAW*, 768 F.2d at 1485 (quoting *Telecomms. Research & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 76 (D.C. Cir. 1984)). Our court has reasoned similarly to exercise jurisdiction to review denials of broadcasting licenses under the Federal Communications Act. *See La Voz Radio de la Communidad v. FCC*, 223 F.3d 313, 318 (6th Cir. 2000). This court's ability to "protect its future jurisdiction," *TRAC*, 750 F.2d at 76, in cases of agency inaction is necessary because "it would defeat th[e] statutory scheme to allow plaintiffs to file preemptive suits in the district court" and thereby avoid the court of appeals. *La Voz*, 223 F.3d at 319 (quoting *Luz v. FCC*, 88 F. Supp. 2d 372, 377 (E.D. Pa. 1999)).

The All Writs Act, 28 U.S.C. § 1651(a), empowers the court of appeals to protect its future jurisdiction. The "statutory commitment of review of [agency] action to the Court of Appeals, read in conjunction with the All Writs Act, affords this court jurisdiction over claims of unreasonable [agency] delay." *TRAC*, 750 F.2d at 75 (citation omitted). Section 1651 allows this court to "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[]." While the All Writs Act has traditionally provided a mechanism by which the court of appeals directs "an inferior court," *Roche v.*

*Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943), "[t]he authority of an appellate court to issue mandamus to an agency is analogous to its authority to issue the writ to District Courts." *TRAC*, 750 F.2d at 76 n.28; *see also Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 293 n.6 (3d Cir. 2007); *George Kabeller, Inc. v. Busey*, 999 F.2d 1417, 1422 (11th Cir. 1993). In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004), the Supreme Court compared the ability of courts to compel an agency to act under the APA with the power of courts under the All Writs Act, § 1651.

The district court properly determined, moreover, that because there was jurisdiction in our court, the district court lacked jurisdiction. *See Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 421-22 (1965); *TRAC*, 750 F.2d at 77 (collecting cases). The Mine Act provides that "[t]he procedures of this subsection shall be the exclusive means of challenging the validity of a mandatory health or safety standard." Mine Act § 101(d), 30 U.S.C. § 811(d). Although this language does not specifically cover the agency's failure to promulgate a standard, because the court's jurisdiction includes review of agency action and inaction, the court of appeals' jurisdiction is exclusive in both circumstances. *See TRAC*, 750 F.2d at 77. Otherwise claims for agency inaction could still be filed in the district court and the court of appeals could not properly "protect its future jurisdiction." *See id.* at 76.

**III.**

Just as jurisdiction to review agency inaction tracks jurisdiction to review final agency action, so does the requirement that the petitioner first exhaust his administrative remedies. Howard in this case did not petition for rulemaking to the agency; if he had done so he would either have been successful or would have obtained a considered agency denial that would assist us in our review. In connection with a challenge to the validity of a promulgated standard, the Mine Act provides that "[n]o objection that has not been urged before the Secretary shall be considered by the court, unless the failure or neglect to urge such objection shall be excused for good cause shown." Mine Act § 101(d), 30 U.S.C. § 811(d). Although § 101(d) could be read literally to cover only claims arising out of agency action, this would create the anomalous situation that the

reviewing court would require resort to the agency, taking into account the agency's expertise and primary responsibility, when a PEL is promulgated, but not when the agency declines to promulgate a PEL. Yet deference to agency expertise and primary responsibility is traditionally at least as strong, if not much stronger, when an agency declines to act. *Cf. Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). Moreover, the Mine Act envisions that parties will take advantage of administrative remedies even before a PEL is promulgated. Specifically, the Act notes that "interested person[s]" may submit information to the Secretary regarding PELs. Mine Act § 101(a)(1), 30 U.S.C. § 811(a)(1). Therefore, the statutory requirement of exhaustion of available remedies must be read to apply to review of agency inaction under the Mine Act.

Howard has not shown good cause for his failure to exhaust. Exhaustion is not futile here because if Howard petitioned for rulemaking, the Secretary would have the opportunity to explain her reasons for not promulgating a PEL. As the Supreme Court has explained,

> [t]he exhaustion doctrine also acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court. Correlatively, exhaustion principles apply with special force when "frequent and deliberate flouting of administrative processes" could weaken an agency's effectiveness by encouraging disregard of its procedures.

*McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) (citation omitted). The NIOSH and committee reports from the mid-1990s recommended PELs among other regulatory options, but fell short of concluding that lower PELs were absolutely necessary. The Secretary has not promulgated lower PELs on the theory that increasing compliance with existing PELs would decrease miners' health risks. If Howard petitions for a lower PEL, the Secretary assures us, the agency would make a considered determination, capable of judicial review, as to whether to promulgate a lower PEL. This would have the benefit of creating a record that would facilitate judicial review. "[E]ven where a controversy survives administrative review, exhaustion of the administrative procedure may produce

a useful record for subsequent judicial consideration, especially in a complex or technical factual context." *Id.*

Because Howard did not exhaust the available administrative remedies, the petition is dismissed.