FILED
United States Court of Appeals
Tenth Circuit

October 11, 2016

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

STATE OF WYOMING,

     Petitioner-Appellant,

v.

UNITED STATES DEPARTMENT
OF THE INTERIOR; SALLY
JEWELL, in her official capacity as
Secretary of the Interior; UNITED
STATES BUREAU OF LAND
MANAGEMENT; and NEIL
KORNZE, in his official capacity as
Director of the Bureau of Land
Management,

     Respondents-Appellees.

_____

AMERICAN WILD HORSE
PRESERVATION CAMPAIGN;
RETURN TO FREEDOM; THE
CLOUD FOUNDATION; CAROL
WALKER; KIMERLEE CURYL,

     Intervenors-Appellees.

_____

WYOMING STOCK GROWERS
ASSOCIATION,

     Amicus Curiae.

No. 15-8041

Michael J. McGrady, Senior Assistant Attorney General, Wyoming Attorney General's Office, Cheyenne, Wyoming, for Petitioner-Appellant.

Allen M. Brabender, Attorney, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., (Arthur R. Kleven, Attorney, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; John C. Cruden, Assistant Attorney General, Environment & Natural Resources Division, Washington, D.C.; Alison C. Finnegan, Attorney, United States Department of Justice, Environment Natural Resources Divsion, Washington, D.C., with him on the brief), for Respondents-Appellees.

William S. Eubanks, II, Meyer Glitzenstein & Eubanks LLP, Ft. Collins, Colorado (Katherine A. Meyer, Meyer Glitzenstein & Eubanks LLP, Washington, D.C., with him on the brief), for Intervenors-Appellees.

Maegan L. Woita and Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colorado, filed an amicus curiae brief on behalf of the Wyoming Stock Growers Association.

Before **BRISCOE**, **McKAY** and **MATHESON**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Petitioner State of Wyoming (the State) filed this action against the United States Department of the Interior, the Secretary of the Department, and the acting director of the Bureau of Land Management (BLM) seeking judicial review of what the State claimed was their failure to comply with non-discretionary

obligations imposed upon them by the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340 (1982).  More specifically, the State alleged that respondents were statutorily obligated, but had failed, to properly manage the overpopulation of wild horses on seven areas of public land in Wyoming. Respondents moved to dismiss the petition for failure to state a claim upon which relief could be granted.  The district court granted respondents' motion and dismissed the action.  The State now appeals.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

*The Wild Free-Roaming Horses and Burros Act*

The Wild Free-Roaming Horses and Burros Act (the Act), 16 U.S.C. §§ 1331-1340, was enacted by Congress in 1971 pursuant to the Property Clause of the United States Constitution.  Mountain States Legal Found. v. Hodel, 799 F.2d 1423, 1425 (10th Cir. 1986).  As its name suggests, the Act was designed to protect from "capture, branding, harassment, or death," the wild horses and burros that roam the rangelands of the western United States.  Id. (quoting 16 U.S.C. § 1331).  "[T]he Act declares wild horses and burros to be an 'integral part of the natural system of the public lands,' 16 U.S.C. § 1331 (1982), and mandates that the animals be managed 'as components of the public lands.'"  Id. (quoting 16 U.S.C. § 1333(a)).

The Act proved to be effective at remedying the decline of wild horse

3

herds.  Indeed, the Act proved almost too effective, as excess numbers of wild horses began to pose a threat to habitat conditions.  In 1978, Congress concluded that amendments to the Act were necessary "to facilitate the humane adoption or disposal of excess wild free-roaming horses and burros . . . because they [were] exceed[ing] the carrying capacity of the range, [and] pos[ing] a threat to their own habitat, fish, wildlife, recreation, water and soil conservation, domestic livestock grazing, and other rangeland values . . . ."  Pub. L. No. 95-514, § 2(a)(6), 92 Stat. 1803, 1803 (1978) (codified as amended at 43 U.S.C. § 1901(a)(6)).  Accordingly, Congress amended the Act to give the Secretary of the Interior greater authority to manage wild horses on public lands.  Id. § 14, 92 Stat. at 1808-10.

*The BLM and its management obligations*

In the Act, Congress designated the BLM to oversee the management of wild horses and burros on public lands.  BLM manages wild horses on public lands within what it calls designated herd management areas (HMAs).  43 C.F.R. § 4710.3-1.  HMAs and their boundaries are established by BLM in Resource Management Plans (RMPs).  RMPs are prepared through a land-use planning process conducted pursuant to the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 et seq.  To comply with the Act's directive to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands," 16 U.S.C. § 1333(a), the BLM (a)

4

maintains a current inventory of wild horses in each HMA, (b) determines the appropriate management level (AML) of wild horses that each HMA can sustain, and (c) determines the method of achieving the designated AML. Id. § 1333(b)(1); 43 C.F.R. §§ 4710.2, 4710.3-1.

The Act does not define the phrase "appropriate management level." The BLM itself generally defines AML "as a population range within which [wild horses and burros] can be managed for the long term." Bureau of Land Mgmt., U.S. Dep't of Interior, BLM Handbook H-4700-1, Wild Horses and Burros Management Handbook 17 (2010), http://www.blm.gov/style/medialib/blm/wo/ Information_Resources_Management/policy/blm_handbook.Par.11148.File.dat/H-4700-1.pdf. According to the BML, "[t]he AML upper limit shall be established as the maximum number of [wild horses and burros] which results in a [thriving natural ecological balance] and avoids a deterioration of the range." Id. "This number," the BLM states, "should be below the number that would cause rangeland damage." Id. (citation omitted). "The AML lower limit shall normally be established at a number that allows the population to grow (at the annual population growth rate) to the upper limit over a 4-5 year period, without any interim gathers to remove excess [wild horses and burros]." Id.

*The seven HMAs at issue*

Seven HMAs are at issue in this lawsuit: Antelope Hills, Crooks Mountain, Green Mountain, Lost Creek, Stewart Creek, Fifteenmile, and Little Colorado.

5

The State owns varying amounts of acreage in each of these seven HMAs. Aplt. App. at 20-21 (listing State acreage per HMA). It is undisputed that the BLM's 2014 population estimates indicate that the wild horse populations on each of these seven HMAs exceed the upper limit of their respective AMLs.

*The State's demand to the BLM*

On August 21, 2014, the State, through Governor Mead, wrote to the Secretary of the Interior and the Acting Director of the BLM claiming that these seven HMAs "contain[ed] wild horses in excess of AML." Id. at 17. The letter further stated that AMLs "determine when an overpopulation exists, triggering the [BLM's] non-discretionary duty to remove excess animals from an HMA." Id. The letter stated that the State would "proceed in court against [the Secretary and the Acting Director] in [their] official capacit[ies] . . . for failure to comply with non-discretionary duties in the . . . Act unless the violations identified in th[e] letter [we]re remedied within 60 days." Id. at 18. On October 28, 2014, the State sent a follow-up letter stating, in pertinent part, that because the BLM "ha[d] not taken action or responded to [the first] letter," the State "consider[ed] [this] silence to be a final decision not to act." Id. at 176. The letter in turn stated that Governor Mead "intend[ed] to instruct the Wyoming Attorney General to file suit." Id.

*The BLM's response*

The BLM finally responded by letter on November 5, 2014. The letter

6

stated, in pertinent part:

> The BLM acknowledges your concerns about expanding wild horse populations and understands the need to manage populations within Appropriate Management Levels (AMLs), along with other responsibilities under the Act.
>
> As you know, on October 8th the BLM Wyoming State Office removed 1,263 wild horses from the checkerboard area in southwestern Wyoming. This large removal was in compliance with the Act and the Rock Springs Grazing Association Consent Decree. It reduced the wild horse populations in the affected Herd Management Areas to below AML.
>
> Gather plans for fiscal year 2015 are currently being developed. As the BLM plans management activities for 2015, we will carefully consider the actions needed in Wyoming along with all wild horse management requirements in 10 western states. The BLM will utilize our resources and capabilities to the maximum extent possible under the circumstances, including the limited capacity at holding facilities.
>
> We request your continued assistance in collaborating with the BLM and stakeholders to identify a strategy for Wyoming that recognizes the many challenges we face to achieve a fiscally and ecologically sustainable program. We look forward to working with you and your staff to resolve these concerns.

Id. at 178.

II

On December 8, 2014, the State initiated this action by filing what it styled as a "PETITION FOR REVIEW OF FINAL AGENCY INACTION." Id. at 12. The State's petition sought judicial review under the Administrative Procedure Act (APA), specifically 5 U.S.C. § 706(1),[1] of what the State described as the

_____

[1] Section 706(1) states that a "reviewing court shall . . . compel agency
(continued...)

7

respondents' "final decision not to manage wild horses in Wyoming according to their mandatory, non-discretionary obligations under the Act." Aplt. App. at 13. In support, the petition alleged that "[r]espondents [we]re in violation of the Act for failing to adequately management [sic] overpopulations of wild horses on public lands in Wyoming . . . ." Id. at 14. The petition asked the district court to "[o]rder that the [r]espondents take immediate action to remove excess wild horses from Wyoming public lands and prevent wild horse overpopulations in Wyoming . . . ." Id.

Respondents moved to dismiss the complaint for failure "to state a claim for which relief c[ould] be granted under the . . . Act or the [APA] because . . . [r]espondents do not have a mandatory duty to remove wild horses from the [HMAs] at issue in the [p]etition." Id. at 180.

On April 21, 2015, the district court issued an order granting respondents' motion to dismiss. In doing so, the district court concluded that "the State's petition fail[ed] to set forth a discrete agency action that BLM [wa]s required to take" under the Act. Id. at 335.

Judgment in the case was entered that same day. The State filed a notice of appeal on June 19, 2015.

---

[1](...continued)
action unlawfully withheld or unreasonably delayed . . . ." 5 U.S.C. § 706(1).

## III

In its appeal, the State challenges the district court's order dismissing its petition for failure to state a claim upon which relief can be granted under the Act or the APA. "We 'review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim . . . .'" Wasatch Equal. v. Alta Ski Lifts Co., 820 F.3d 381, 386 (10th Cir. 2016) (quoting Gee v. Pacheco, 627 F.3d 1178, 1183 (10th Cir. 2010)). "In reviewing the complaint, we 'accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same,' but we [do not] accept the nonmoving party's legal conclusions as true." Id. (quoting Colony Ins. Co. v. Burke, 698 F.3d 1222, 1228 (10th Cir. 2012); and citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

The question before us is whether the State's petition states a valid claim under the APA that the BLM "unlawfully withheld or unreasonably delayed" action that it was required to take under Section 3 of the Act. 5 U.S.C. § 706(1); see Norton v. SUWA, 542 U.S. 55, 64 (2009) ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.") (emphasis in original). More specifically, the question is whether, as the State alleged in its petition, Section 3 obligated the BLM to gather or otherwise remove excess wild horses from each of the seven HMAs once it learned that the wild horse population in each of those HMAs exceeded the upper limit of their respective AMLs.

9

Section 3 of the Act declares that "[all] wild free-roaming horses . . . are . . . under the jurisdiction of the Secretary [of the Interior] for the purpose of management and protection . . . ." 16 U.S.C. § 1333(a). It in turn directs the Secretary "to protect and manage wild free-roaming horses . . . as components of the public lands" and "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." Id. "All management activities," Section 3 provides, "shall be at the minimal feasible level . . . ." Id.

Of particular relevance here, subsection (b) of Section 3 outlines the Secretary's duties with respect to inventorying wild horses and dealing with overpopulation issues:

> (1) The Secretary shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands. *The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels).* In making such determinations the Secretary shall consult with the United States Fish and Wildlife Service, wildlife agencies of the State or States wherein wild free-roaming horses and burros are located, such individuals independent of Federal and State government as have been recommended by the National Academy of Sciences, and such other individuals whom he determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management.
>
> (2) *Where the Secretary determines on the basis of (i) the current inventory of lands within his jurisdiction*; (ii) information contained

10

in any land use planning completed pursuant to section 1712 of Title 43; (iii) information contained in court ordered environmental impact statements as defined in section 1902 of Title 43; and (iv) such additional information as becomes available to him from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i-iv) above on the basis of all information currently available to him, *that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels*. Such action shall be taken, in the following order and priority, until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation:

> (A) The Secretary shall order old, sick, or lame animals to be destroyed in the most humane manner possible;
>
> (B) The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines an adoption demand exists by qualified individuals, and for which he determines he can assure humane treatment and care (including proper transportation, feeding, and handling): *Provided*, That, not more than four animals may be adopted per year by any individual unless the Secretary determines in writing that such individual is capable of humanely caring for more than four animals, including the transportation of such animals by the adopting party; and
>
> (C) The Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible.

Id. § 1333(b)(1)–(2) (emphasis added).

The State argues that Section 3 "clearly requires the [BLM] to remove excess wild horses when the population of [an HMA] exceeds what the agency

11

has determined through thorough analysis to be the [AML] for the area." Aplt. Br. at 23. In other words, the State argues, "surpassing the [AML] triggers the . . . Act's requirement to remove excess horses." Id. at 21. The State also alleges that in this case, the BLM "identified the" AML for each of the seven HMAs at issue and subsequently "collected inventory data showing an overpopulation" in each of them. Id. "The Act," the State argues, thus "leaves nothing for the [BLM] to do but remove the excess wild horses in the seven areas." Id.

The State's arguments, however, are contrary to the plain language of Section 3. After directing the BLM to "maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands," subsection (b)(1) states that "[t]he purpose of such inventory shall be," in pertinent part, "to . . . make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals[,] . . . and [to] determine whether [AMLs] should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." 16 U.S.C. § 1333(b)(1). Subsection (b)(1)'s use of the phrase "whether action should be taken to remove excess animals" quite clearly affords the BLM with discretion to decide whether or not to remove excess animals.

Any doubts on this score are negated by the language of subsection (b)(2). It provides, in pertinent part, that the BLM "shall immediately remove excess

12

animals from the range so as to achieve [AMLs]" only after the BLM "determines . . . that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals . . . ." Id. § 1333(b)(2) (emphasis added). In other words, contrary to the State's argument, a determination that an overpopulation exists in a given HMA is not sufficient, standing alone, to trigger any duty on the part of the BLM. Instead, the BLM must also determine that action is necessary to remove excess animals.

Turning to the facts alleged in the State's petition, it is indisputable that only the first of these statutory requirements has been met, i.e., the determination of an overpopulation in each of the seven HMAs. Importantly, the second requirement has not been satisfied because the BLM has not determined that action is necessary to remove the excess animals. Consequently, the State cannot establish that the BLM has "unlawfully withheld or unreasonably delayed" action that it was required to take under Section 3 of the Act, and thus has failed to state a claim upon which relief can be granted under the APA. 5 U.S.C. § 706(1).

The State also argues that "[t]he district court . . . erred in concluding that the [BLM] has discretion to wait for more proof that removal is necessary." Aplt. Br. at 21. In support, the State argues that "[w]hile Congress afforded the agency discretion to determine [an] area's [AML], in 1978 Congress removed any discretion the [BLM] might have had to ignore its own monitoring data showing that an overpopulation exists and that removal is necessary to restore an area back

13

to the [AML]." Id. In other words, the gist of the State's argument on this point appears to be that AMLs "represent the agency's scientific determination about how many horses a particular [HMA] can sustain without threatening the area's thriving natural ecological balance or causing range deterioration." Id. at 24. Thus, the State asserts, once it is determined that the wild horse population in an HMA exceeds its AML, it is established that removal is necessary and the BLM "no longer has discretion" to fail or refuse to act. Id. "Therefore," the State argues, "this Court should reverse the district court's dismissal and hold the [BLM] to its own analysis and to Congress's mandate in the . . . Act to perform the discrete, non-discretionary action being unlawfully withheld—the removal of excess wild horses from the overpopulated [HMAs] in Wyoming." Id. at 21-22.

We reject the State's arguments and conclude that they are nothing more than a reformulation of its main argument. As noted, the Act does not define the phrase "appropriate management level" and thus does not equate it with any requirement to remove excess animals from a particular HMA. Nor does the BLM itself define the phrase as equivalent to a determination that removal is necessary. Further, and most importantly, the language of Section 3, as discussed above, clearly requires both a determination by the BLM "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals . . . ." 16 U.S.C. § 1333(b)(2) (emphasis added). Because only the first of these determinations has been made, the BLM is under no statutory

14

duty to remove animals from the seven HMAs at issue. Moreover, there is nothing in the statute that obligates the BLM to make an immediate determination regarding the second requirement.

IV

The judgment of the district court is AFFIRMED.

15